Sarah Flint and Wayne Spencer Frank,
Plaintiffs-Appellants,

v.

Barbara A. O'Connell, M.D., Defendant-
Respondent.

Court of Appeals

*No. 01–1021. Oral argument December 12, 2001.—Decided
April 11, 2002.*

2002 WI App 112

(Also reported in 648 N.W.2d 7.)

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Donald J. Jacquart, David P. Lowe*, and *Paul R. Jacquart* of *Jacquart & Lowe, S.C.* of Milwaukee.

On behalf of the defendant-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, *Charles D. Hoornstra*, assistant attorney general, and *James McCambridge*, assistant attorney general.

Before Vergeront, P.J., Roggensack and Lundsten, JJ.

¶ 1. ROGGENSACK, J. Sarah Flint and Wayne Spencer Frank[1] sued Dr. Barbara A. O'Connell for negligently failing to diagnose Flint's pregnancy in a timely fashion. Flint and Frank contend that O'Connell's negligence prevented Flint from electing to have an abortion which caused them damages associated with the pregnancy, its effects on Flint's health and the costs of raising the healthy child born to them as a result. Because we conclude that Flint and Frank have not made a showing sufficient to distinguish the public policy concerns underlying the supreme court's prohibition against recovery of the costs of raising a healthy child due to the failure to diagnose a pregnancy that are set out in *Rieck v. Medical Protective Co.*, 64 Wis. 2d 514, 219 N.W.2d 242 (1974), we affirm the judgment of the circuit court dismissing their claims for this type of damages. However, in regard to Flint's claims that O'Connell's failure to diagnose resulted in exacerbation of her chronic illness and associated consequences, we reverse the circuit court prior to a full public policy analysis of the remaining damages that were alleged and remand for further proceedings consistent with this opinion.

## BACKGROUND

¶ 2. Flint was diagnosed with systemic lupus erythematosus in 1985. In 1994, for issues related to her lupus, Flint was referred to O'Connell, a licensed gynecologist. Flint subsequently informed O'Connell

---

[1] Flint and Frank, the child's father, were married after the birth of their son.

that she had had a positive pregnancy test and that she wished to undergo an abortion for personal and medical reasons.

¶ 3.  In accordance with Flint's decision, O'Connell performed a procedure to abort a pregnancy in January 1995. However, it was later determined that Flint had not been pregnant. After this experience with Flint's "false positive" pregnancy test, O'Connell prescribed an oral contraceptive, but Flint never used it. At about the same time, O'Connell also diagnosed Flint as suffering from premature ovarian failure or "premature menopause."

¶ 4.  Between mid-November 1997 and early January 1998, Flint made several telephone calls to O'Connell's office because of recurring periods of nausea, lower abdominal pain and vaginal bleeding. Based on their initial communication during this period, O'Connell adjusted the medication Flint was taking for ovarian failure. Because Flint continued to report abdominal pain and nausea, an examination was scheduled. When O'Connell examined Flint on January 12, 1998, she did not note an enlarged uterus, nor did she diagnose Flint's pregnancy, which was then on-going.

¶ 5.  On March 3, 1998, Flint saw a rheumatologist whom she told that she felt movement within her pelvis. The rheumatologist ordered an ultrasound study which showed Flint was well into the second trimester of pregnancy. Flint sought the opinion of an obstetrician who specializes in high-risk pregnancies and continued with the pregnancy. She gave birth to a healthy baby boy on May 31, 1998.

¶ 6.  After the diagnosis of her pregnancy, Flint discontinued some of the medication she had been taking for lupus. Subsequent to her son's birth, she experienced a decrease in kidney function, which even-

tually ended in renal failure and a kidney transplant. Flint contends that her kidney failure was a result of having stopped medication during pregnancy, which pregnancy she claimed to have learned of when it was too late to have an abortion.

¶ 7.   In the second amended complaint, Flint and Frank allege that O'Connell provided negligent care by failing to inform Flint that she could become pregnant and by failing to diagnose the pregnancy in time to abort the fetus. O'Connell denied all material allegations, including the assertion that Flint learned of the pregnancy when it was too late for an abortion, and she moved for summary judgment of dismissal.

¶ 8.   In deciding O'Connell's motion for summary judgment, the circuit court determined that public policy precludes recovery for all types of damages on the claim that O'Connell negligently failed to diagnose Flint's pregnancy. However, the court also concluded that if Flint proves that O'Connell negligently failed to inform her about the possibility of becoming pregnant, she could potentially recover the claimed damages, including expenses related to the kidney transplant and the costs of raising her healthy son to the age of majority.

¶ 9.   In response to the court's ruling, the parties reached a stipulation whereby they agreed to conditionally dismiss the claim that O'Connell failed to inform Flint that she could become pregnant.[2] The circuit

---

[2] The stipulation provides that if Flint's "failure to diagnose" claim is reinstated on appeal, O'Connell agrees to reinstate the "failure to inform" claims on remand. If, on the other hand, Flint's appeal is not successful, the stipulation provides that all claims for relief will be dismissed with prejudice. Accordingly, Flint's "failure to inform" claim is not before us on appeal, except insofar as it retains the costs of raising a healthy

court accepted the stipulation and entered final judgment in favor of O'Connell. Flint appeals.

## DISCUSSION

**Standard of Review.**

¶ 10. We review summary judgment decisions *de novo,* applying the same standards employed by the circuit court. *Guenther v. City of Onalaska,* 223 Wis. 2d 206, 210, 588 N.W.2d 375, 376 (Ct. App. 1998). We first examine the complaint to determine whether it states a claim, and then we review the answer to determine whether it joins a material issue of fact or law. *Smith v. Dodgeville Mut. Ins. Co.,* 212 Wis. 2d 226, 232, 568 N.W.2d 31, 34 (Ct. App. 1997). If we conclude that the complaint and answer are sufficient to join issue, we examine the moving party's affidavits to determine whether they establish a *prima facie* case for summary judgment. *Id.* at 232–33, 568 N.W.2d at 34. If they do, we look to the opposing party's affidavits to determine whether there are any material facts in dispute that entitle the opposing party to a trial. *Id.*

¶ 11. Here, the question presented is whether public policy precludes recovery of damages based on O'Connell's alleged negligence in failing to diagnose Flint's pregnancy.[3] Whether public policy considerations preclude the recovery of damages for a

child as a component of damages, which we conclude below are not available unless they result from a negligently performed sterilization.

[3] In support of her motion for summary judgment, O'Connell focused only on a public policy basis for dismissal. Therefore, she provided no competent evidence to disprove

defendant's negligence in a given case is a question of law that we review *de novo. Bowen v. Lumbermens Mut. Cas. Co.*, 183 Wis. 2d 627, 635, 654, 517 N.W.2d 432, 435, 443 (1994) ("The application of public policy considerations is a function solely of the court.").

## Public Policy.

### *1. Overview.*

■

¶ 12. In Wisconsin, one is obligated to exercise reasonable care such that one does not cause foreseeable harm to another. *Marciniak v. Lundborg*, 153 Wis. 2d 59, 64, 450 N.W.2d 243, 245 (1990). However, even when negligence has been proved, public policy considerations may preclude recovery of damages. Therefore, "negligence plus an unbroken sequence of events estab-

---

Flint's assertion that she learned of her pregnancy too late to obtain an abortion and in support of her own denial of that material fact. It would have been better practice for O'Connell to have submitted an affidavit supporting her denial of Flint's contention that at the twenty-third week of pregnancy an abortion was no longer possible and to have given Flint the opportunity to provide competent evidence to support her factual assertion. In that way, it would have become clear whether a trial on this material fact was required or whether Flint had no viable claim of any type. (The only evidence in the record on this factual dispute is Flint's statement in her deposition that she had been told that her pregnancy was too far along for an abortion. That evidence is insufficient to sustain Flint's burden on this material issue, as a matter of law, because whether an abortion can be performed at the twenty-third week of pregnancy is a medical fact requiring expert testimony. *See State v. Whitaker*, 167 Wis. 2d 247, 255, 481 N.W.2d 649, 652 (Ct. App. 1992); *Fritz v. McGrath*, 146 Wis. 2d 681, 689, 431 N.W.2d 751, 755 (Ct. App. 1988)).

lishing cause-in-fact does not always and necessarily lead to a determination that a defendant is liable for the plaintiff's injuries." *Id.* at 65, 450 N.W.2d at 245. A defendant may be relieved of liability for public policy reasons if any one of the following six factors is present:

> (1) The injury is too remote from the negligence; or (2) the injury is too wholly out of proportion to the culpability of the negligent tort-feasor; or (3) in retrospect it appears too highly extraordinary that the negligence should have brought about the harm; or (4) because allowance of recovery would place too unreasonable a burden (in the case before us, upon physicians and obstetricians); or (5) because allowance of recovery would be too likely to open the way for fraudulent claims; or (6) allowance of recovery would enter a field that has no sensible or just stopping point.

*Rieck*, 64 Wis. 2d at 517–18, 219 N.W.2d at 244.

■

¶ 13.    Generally, public policy determinations proceed on a case-by-case basis because claim-specific facts are often relevant to the analysis. *Bowen*, 183 Wis. 2d at 660, 517 N.W.2d at 445–46. In some cases, the pleadings may present a question of public policy that can be resolved on a motion to dismiss or a motion for summary judgment. *Id.* at 654–55, 517 N.W.2d at 443. In other cases, a full trial may be desirable prior to the court's public policy determination. *Id.*

### 2. Failure to diagnose Flint's pregnancy.

¶ 14.    Flint alleges that O'Connell negligently failed to diagnose her pregnancy. She alleges this negligence caused her to give birth to her son because when she subsequently learned she was pregnant, it was too late to have an abortion. The economic damages sought include lost wages, medical costs associated with the

pregnancy, the birth and Flint's kidney failure, as well as the costs associated with raising her son. Flint also claims non-economic damages related to the stresses of the pregnancy and her later kidney failure. Therefore, the question presented is whether, assuming *arguendo* that Flint has proved all the elements of her negligence claim, public policy nevertheless precludes recovery of some or all of the claimed damages.

¶ 15.   In *Rieck*, the supreme court applied a public policy analysis to damages sought for negligence based on a physician's alleged failure to diagnose a pregnancy. Because O'Connell contends that *Rieck* controls the public policy issue presented by Flint's claim and because Flint claims that *Rieck* can be distinguished on its facts, we begin our discussion with *Rieck*. There, plaintiffs alleged that:   (1) an examining physician negligently failed to diagnose a pregnancy; (2) by the time the pregnancy was diagnosed, it was too late to abort the fetus; and (3) if the first physician had timely diagnosed the pregnancy, the mother would have undergone an abortion "because of personal reasons relating to the health of Mrs. Rieck, and the general welfare of the Rieck family." *Rieck*, 64 Wis. 2d at 515–16, 219 N.W.2d at 243. In their complaint, the Riecks sought damages for the stresses involved and the costs associated with raising a child who, although born healthy, was alleged to have been unwanted. *Id.*

¶ 16.   On these facts and focusing on the types of damages that were requested,[4] the supreme court considered the six public policy factors listed above and

---

[4] The plaintiffs had requested the financial costs of raising their healthy child to the age of majority, while keeping all the benefits associated with raising the child. *Rieck v. Medical Protective Co.*, 64 Wis. 2d 514, 517–18, 219 N.W.2d 242, 244 (1974).

held that several of them applied to bar recovery. Addressing concerns about the authenticity of the plaintiffs' claim, the court held:

> The complaint here alleges what the parents of the child would have done if they had been informed of the fact of pregnancy at the time of the mother's consulting the obstetrician sued. At the time of trial it is entirely predictable that the parents would have firmly testified to the fact of such intention, and its fixed and unalterable character. It is cultivating the obvious to state that, if the door were opened to recovery under such allegation and such subjective testimony as to state of mind or intention, the temptation would be great for parents, where a diagnosis of pregnancy was not timely made, if not to invent an intent to prevent pregnancy, at least to deny any possibility of change of mind or attitude before the action contemplated was taken. *We have no hesitancy in concluding that to hold that the allegations of this complaint constitute a cause of action for recoverable damages would open the way for fraudulent claims and would enter a field that has no sensible or just stopping point.*

*Id.* at 519, 219 N.W.2d at 245 (emphasis added). The court also concluded that shifting the entire cost of a healthy child's upbringing to a physician who failed to determine and inform the parents of the fact of pregnancy would, under the circumstances there alleged, be wholly out of proportion to the culpability involved and place too unreasonable a burden upon physicians. *Id.* at 518–19, 219 N.W.2d at 244–45.

¶ 17. Flint contends that additional facts in this case are sufficient to distinguish *Rieck*'s public policy concerns about the authenticity of her claim. For example, Flint argues that her asserted intent to have an abortion is less likely to be fraudulent because (1) she faced a high-risk pregnancy; (2) she previously had

chosen to abort what she believed to be a pregnancy; and (3) prior to the diagnosis of premature ovarian failure, she had consulted with O'Connell about contraception, even though she never used the contraceptives O'Connell prescribed. Flint contends that because her case involves these additional facts—which, according to her, strongly support the trustworthiness of her stated intent to terminate the pregnancy—public policy favors a jury determination of her claims. In support of this argument, she relies on the supreme court's decision in *Marciniak.*

¶ 18 *Marciniak* involved a claim for negligent performance of a surgical sterilization that resulted in an unwanted pregnancy. *Marciniak,* 153 Wis. 2d at 61–62, 450 N.W.2d at 244. As damages for the negligence, the plaintiff-parents sought the costs associated with raising their healthy, but unintended child. *Id.* The supreme court held that if the plaintiffs were able to prove a negligently performed sterilization, public policy would not prevent recovery of the costs of raising a healthy child. *Id.* at 64, 450 N.W.2d at 245.

¶ 19. The *Marciniak* court expressly addressed *Rieck* and elected to distinguish rather than overrule it. *Marciniak,* 153 Wis. 2d at 70, 450 N.W.2d at 247–48. In concluding that *Rieck* was not controlling in cases involving allegations of negligent sterilization, the supreme court noted that in negligent sterilization cases plaintiffs seek treatment from a physician for the express purpose of *permanently avoiding* conception, and therefore, the plaintiffs have established an interest in avoiding pregnancy before it occurs. In contrast, reasoned the court, the plaintiff-mother in *Rieck* was already pregnant at the time she consulted the physician. Accordingly, Rieck established an interest only in the alleged inability to choose to have an abortion. *Id.* at

70, 450 N.W.2d at 247. The court in *Marciniak* concluded that these differing interests were significant, in part because a woman's decision to undergo surgical sterilization eliminates any concern about a fraudulent claim (*i.e.,* fraud in claiming that the parents intended to permanently avoid pregnancy). *Id.* at 68, 450 N.W.2d at 246–47.

¶ 20. Here, we are faced with two categories of damages: (1) the financial costs of raising a healthy child to adulthood and (2) the damages associated with the deterioration of Flint's health due to the continuation of the pregnancy. Because the public policy analysis is different for each category of damages, we will address them separately.

¶ 21. As we examine the first category of Flint's damages under the public policy analysis of *Rieck* and *Marciniak*, we note that the material facts in *Rieck* which drove the supreme court's decision that damages could not be recovered for the financial costs of raising a healthy child are also present here. For example, the following facts are parallel to the facts underlying the supreme court's policy analysis in *Rieck*: (1) O'Connell is accused of negligently failing to timely diagnose an existing pregnancy; (2) Flint's claimed injury is that she was unable to abort the fetus when her pregnancy was later diagnosed; (3) Flint contends that she would have had an abortion but for the delayed diagnosis; (4) in order to link O'Connell's alleged negligence to the claimed injury, the trier of fact would have to believe that Flint would have aborted the fetus if her pregnancy had been diagnosed when O'Connell last examined her, but that she could not do so when a correct

diagnosis was made;[5] and (5) Flint and Frank will retain all the benefits of parenthood. However, we also note that the affirmative act taken to permanently avoid conception, by which *Marciniak* distinguished *Rieck*, is not present here.

■

¶ 22.   Therefore, we conclude that *Rieck* controls the public policy analysis of the damages associated with the costs of raising a healthy child to the age of majority because Flint had only an interest in an ability to choose to abort her pregnancy. The potential size of such a damage award, when tied to a hypothetical desire to abort an already on-going pregnancy, comes squarely within *Rieck*'s concern that parents in similar circumstances would be tempted either to invent an intent to prevent pregnancy or at least to deny any possibility of a change of mind or attitude about continuation of the pregnancy when pregnancy was discovered.[6] *Rieck*, 64 Wis. 2d at 519, 219 N.W.2d at 245. Furthermore, contrary to Flint's assertion, *Marciniak* stands on footing different from that which Flint pre-

---

[5] Stated another way, if Flint would have chosen to proceed with the pregnancy, or if she could still have obtained a therapeutic abortion at the time of the diagnosis, the claimed damages would not be due to O'Connell's missed diagnosis.

[6] There is no allegation, for example, that Flint's medical condition made pregnancy so dangerous that no reasonable person in her position would ever choose to have a child. Additionally, as part of Flint's submissions to the circuit court, she submitted a letter from Dr. Carolyn Bell who stated, "At this point she is already halfway through the pregnancy and fortunately has not had a major flare, I think it is very likely that Sarah will want to continue the pregnancy." Therefore, her past attitude about continuing the pregnancy may not have been what she now contends it is.

sents. In particular, the potential for fraud in *Marciniak* was much lower because the mother subjected herself to surgical sterilization, thereby demonstrating an interest in permanently avoiding conception. Here, Flint took no steps to obtain a sterilization to permanently prevent pregnancy before it occurred.

¶ 23.  Flint also contends that *Rieck* should be distinguished based on the nature and extent of Flint's physician-patient relationship with O'Connell. In particular, Flint points out that O'Connell had been her treating physician for several years; that O'Connell knew that Flint's lupus would make a pregnancy potentially hazardous; and that, in treating a lupus patient, O'Connell should have been particularly sensitive to monitoring whether Flint was or was not pregnant. We take this argument to suggest that the nature of O'Connell's duty to Flint was different from the duty owed by the defendant in *Rieck*.

¶ 24.  However, in reaching its conclusion regarding the authenticity of the claim, the concern of the court in *Rieck* was not that the physician had not breached a duty of due care. Rather, the court's opinion was directed at preventing the fraudulent recovery of the very significant costs of raising a healthy child as damages by a plaintiff who was already pregnant and now wanted to base a claim for relief on her contention that an abortion was not an option because of the delayed diagnosis. We fail to see how the history of Flint's treatment relationship changes the concern about fraudulent claims for the large damages awards addressed in *Rieck*. Therefore, we conclude that allowing Flint and Frank to recover the costs of raising a healthy child would open the door to fraudulent claims and would permit damages wholly out of proportion to

the culpability involved, thereby placing an unreasonable burden on the physician.

¶ 25. However, we also conclude that the additional, material factual allegations (*see* ¶¶ 17 and 23 above) that were not present in *Rieck,* if proved, could cause the second category of damages to survive a subsequent public policy analysis because claims seeking this category of damages are less likely to be fraudulent. Therefore, even though it is true that the damages relating to the deterioration of Flint's health rest on proof that O'Connell negligently failed to diagnose Flint's pregnancy, that Flint could not have obtained a therapeutic abortion when her pregnancy was diagnosed, that she would never have continued with the pregnancy if she could have had an abortion and that O'Connell's negligence was a substantial factor in the decline in Flint's health, the damages claimed are different from damages for raising a healthy child because they are for personal injuries due to a missed diagnosis such as are commonly associated with medical malpractice. Therefore, it is possible that they may not be wholly out of proportion to the claimed act of negligence. Furthermore, the incitements to fraud are much less likely when the alleged damages result from defined personal injuries rather than from the financial costs of raising a healthy child to majority. For example, it is unlikely that a plaintiff would undergo a kidney transplant without a medical need for that procedure. And finally, there is no benefit to Flint associated with the claimed deterioration of her health, as there is with the costs of raising a healthy child while retaining the benefits of parenthood. Accordingly, although we do not conduct a complete public policy analysis on the limited record before us, we conclude that Flint's claim for

damages relating to the deterioration of her health is not precluded by the same public policies that controlled in *Rieck*.[7] Therefore, we reverse the circuit court insofar as its decision precludes proof of Flint's claim for medical malpractice relating to these damages.

## CONCLUSION

¶ 26. Because we conclude Flint has not made a showing sufficient to distinguish the public policy concerns underlying the supreme court's prohibition against recovery of the costs of raising a healthy child for the failure to diagnose a pregnancy set out in *Rieck*, we affirm the judgment of the circuit court dismissing all claims for this type of damages. However, in regard to Flint's claims that O'Connell's failure to diagnose resulted in exacerbation of her chronic illness and associated consequences, we reverse the circuit court prior to a full public policy analysis of the remaining damages that were alleged and remand for further proceedings consistent with this opinion.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded.

■■■■■■■

[7] We are aware of the risks of deciding a case on public policy grounds when the claims may not have been fully developed before the circuit court. *See Johnson v. Rogers Mem'l Hosp., Inc.*, 2001 WI 68, ¶ 16, 244 Wis. 2d 364, 627 N.W.2d 890.