Shelby R. Nell and Austin R. Omernick,
Plaintiffs-Appellants,

v.

Froedtert & Community Health,
West Bend Clinic, Inc., Defendant-Respondent,

Forward Health, Wisconsin Department of Health
Services, Subrogated Defendant.

Court of Appeals

*No. 2012AP1556. Submitted on briefs October 22, 2012.
—Decided January 30, 2013.*

2013 WI App 40

(Also reported in 829 N.W.2d 175.)

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Kevin G. Keane* of *Host & Keane, S.C.*, Pewaukee.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Barrett J. Corneille* and *David J. Pliner* of *Corneille Law Group, LLC*, Madison.

Before Neubauer, P.J., Reilly and Gundrum, JJ.

¶ 1. NEUBAUER, P.J. Here, we affirm the circuit court's conclusion that public policy precludes recovery of the costs of raising a healthy child as damages for the negligent provision of prenatal vitamins when birth control pills were prescribed. The circuit court granted summary judgment to Froedtert & Community Health, West Bend Clinic, Inc. on Shelby Nell and Austin Omernick's (collectively Nell) complaint against the Clinic, concluding that Nell's suit was barred on public policy grounds. We affirm in part, reverse in part, and remand for further proceedings regarding the mother's claimed personal injury damages allegedly related to the Clinic's negligence because these claims are not sufficiently developed for a public policy determination.

## BACKGROUND

¶ 2. This case is about Shelby Nell's pregnancy with and the birth of her second son. Nell had her first son when she was nineteen years old and her second when she was twenty-one. After the birth of her first son, Nell was prescribed birth control pills by the Clinic. Nell received several refills on her prescription for birth control pills, including one on February 11 or 12, 2009. Nell was familiar with what birth control pills looked like; she had started taking birth control pills when she was fifteen or sixteen. The birth control pills were always small and came in containers that showed daily usage. When she picked up her prescription in February 2009, Nell noticed that the pills were different than the birth control pills she was used to getting. There were no usual birth control pill containers in the bag from the pharmacy. Nell was confused, but "too embarrassed" to call the Clinic.

775

¶ 3. Some time later, before March 26, 2009, Nell's friend told her that the pills the Clinic had given her were prenatal vitamins, not birth control pills. Nell went to the Clinic on March 26, 2009, and the doctor confirmed that her pills were prenatal vitamins instead of birth control pills. Nell left that visit without any birth control pills. Nell continued to have sexual relations with her partner. On April 23, 2009, the Clinic confirmed Nell's positive home pregnancy test. As of April 30, Nell's medical records indicate she was seven weeks and three days pregnant. Nell delivered a healthy baby boy on December 3, 2009.

¶ 4. Nell sued the Clinic, alleging that the Clinic's negligence in giving her the wrong pills caused her to become pregnant and deliver her son. Nell claimed as a result of this negligence she suffered damages including pain and suffering during and after her pregnancy, loss of future earning capacity and the cost of raising her child to age eighteen. The Clinic moved for summary judgment, assuming for the purpose of its motion that Nell could prove causal negligence and arguing that public policy barred liability. The circuit court agreed and granted the Clinic summary judgment.

## DISCUSSION

### Standard of Review

¶ 5. We review de novo the circuit court's decision on summary judgment, employing the same methodology as the circuit court. *Flint v. O'Connell*, 2002 WI App 112, ¶ 10, 254 Wis. 2d 772, 648 N.W.2d 7. We first review the complaint to see if it states a claim, then review the answer to see if issue was joined. *Id.* If so, we

examine the moving party's submissions to determine whether they establish a prima facie case for summary judgment. *Id.* If they do, we examine the opposing party's submissions to determine whether there are any genuine issues of material fact. *Id.* Summary judgment must be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. WIS. STAT. § 802.08(2) (2011–12).[1] Here, we must decide whether Nell's claim is barred as a matter of public policy. This is a question of law we decide de novo. *Flint,* 254 Wis. 2d 772, ¶ 11.

## Viability of Claim for Damages for Cost of Raising a Healthy Child

¶ 6. Three Wisconsin cases have addressed the viability of a claim for the cost of raising a healthy child as damages when a medical provider's negligence causes an allegedly unwanted pregnancy. *Rieck v. Medical Protective Co.,* 64 Wis. 2d 514, 219 N.W.2d 242 (1974), precluded recovery for the cost of raising a healthy child where the defendant doctor failed to diagnose a pregnancy until it was allegedly too late for the mother to abort. *Marciniak v. Lundborg,* 153 Wis. 2d 59, 450 N.W.2d 243 (1990), declined to apply *Rieck*'s preclusion in a case where the mother had become pregnant after undergoing surgical sterilization. Finally, *Flint,* 254 Wis. 2d 772, followed *Rieck,* denying recovery in another failure to diagnose pregnancy case, even when the mother's pre-existing lupus caused serious complications. We discuss each case in turn.

¶ 7. In *Rieck,* the parents claimed that their fourth child was the result of an unwanted pregnancy that was diagnosed too late for medical termination.

[1] All references to the Wisconsin Statutes are to the 2011–12 version unless otherwise noted.

*Rieck*, 64 Wis. 2d at 516. The parents sought to recover the costs of raising the child. *Id.* at 517. In deciding whether public policy barred the Riecks' claim, the supreme court applied the familiar six public policy factors, any one of which can be sufficient to deny recoverability:

> (1) The injury is too remote from the negligence; or (2) the injury is too wholly out of proportion to the culpability of the negligent tort-feasor; or (3) in retrospect it appears too highly extraordinary that the negligence should have brought about the harm; or (4) because allowance of recovery would place too unreasonable a burden (in the case before us, upon physicians and obstetricians); or (5) because allowance of recovery would be too likely to open the way for fraudulent claims; or (6) allowance of recovery would enter a field that has no sensible or just stopping point.

*Id.* at 517–18. Determination of whether these factors preclude recovery is made on a case-by-case basis, as the facts of a case are often relevant to the analysis. *Flint*, 254 Wis. 2d 772, ¶ 13.

¶ 8. The *Rieck* court first reasoned that shifting the costs of raising the child to the doctor while allowing the parents to retain all the benefits of the child's love and affection would create a new category of surrogate parent and that the burden of liability would be wholly out of proportion to the doctor's culpability. *Rieck*, 64 Wis. 2d at 518–19. The court next concluded that allowing this claim would open the door to fraudulent claims and "enter a field that has no sensible or just stopping point," as parents could "invent an intent to prevent pregnancy." *Id.* at 519. In sum, the court concluded "it would contravene sound public policy to

hold recoverable the damages claimed for the negligence alleged in this case and under these circumstances." *Id.* at 520.

¶ 9. The defendants in *Marciniak* argued that *Rieck* applied to preclude recovery of the costs of raising a child as damages caused by a negligently performed surgical sterilization. *Marciniak*, 153 Wis. 2d at 69. The supreme court distinguished *Rieck* on public policy grounds, allowing recovery. Key to the court's decision was the difference between a woman claiming the intent to terminate an existing pregnancy (*Rieck*) and the desire to avoid pregnancy in the first place (*Marciniak*). *Marciniak*, 153 Wis. 2d at 70. Additionally, the court found the difference in the doctors' levels of culpability significant. *Id.* In *Rieck*, the doctor failed to diagnose a seven-week pregnancy; there was no allegation that the plaintiffs ever told the doctor that the purpose of the examination was to have an abortion if pregnant. *Marciniak*, 153 Wis. 2d at 70. In *Marciniak*, the express purpose of treatment was to permanently avoid pregnancy. *Id.* Regarding a concern for fraudulent claims, the court noted that Marciniak's "seeking and subsequently being the subject of surgery eliminates that concern." *Id.* at 68. The court rejected the defendants' other public policy arguments, concluding that the damages were not too speculative, were not out of proportion to culpability, would not create a surrogate parent in the doctor, did not enter a field with no sensible stopping point, would not psychologically harm the child and would not debase the sanctity of life. *Id.* at 66–68.

¶ 10. In *Flint*, the court of appeals applied *Rieck* in a failure-to-diagnose case where the mother's lupus caused significant complications during and after the pregnancy. A few years prior to the pregnancy at issue in the case, Flint had terminated what she thought was

779

a pregnancy, though it turned out she had not been pregnant. *Flint*, 254 Wis. 2d 772, ¶ 3. Flint's doctor prescribed an oral contraceptive and, "about the same time," informed Flint that she had premature ovarian failure, or "premature menopause." *Id.* Flint never took the prescribed oral contraceptives. *Id.*

¶ 11. Nearly three years later, Flint called her doctor with nausea, abdominal pain and vaginal bleeding. *Id.*, ¶ 4. The doctor examined Flint, but did not diagnose her then-ongoing pregnancy. *Id.* Flint's pregnancy was not diagnosed until months later, well into the second trimester. *Id.*, ¶ 5. During her pregnancy, Flint discontinued use of her lupus medication. *Id.*, ¶ 6. She gave birth to a healthy baby, but she herself suffered renal failure after the birth and had to have a kidney transplant. *Id.*, ¶¶ 5–6. Flint contended that her kidney failure was due to the pregnancy, which she claimed she learned of when it was too late to abort. *Id.*, ¶ 6.

¶ 12. Flint alleged negligence in failing to diagnose the pregnancy. *Id.*, ¶ 7. Flint argued that her high-risk pregnancy, her previous abortion and her previous consultation about contraceptives all ensured the trustworthiness of her stated intention to terminate the pregnancy. *Id.*, ¶ 17. These facts, she argued, made her case more like *Marciniak*, where the court had relied on the plaintiff's surgical sterilization to show credibility of the desire to avoid pregnancy. *See Flint*, 254 Wis. 2d 772, ¶¶ 17–18.

¶ 13. Regarding Flint's claimed damages for the cost of raising her child (as opposed to her damages for her own deterioration in health), the court determined that the same facts that drove the public policy determination in *Rieck* were present. The cases were parallel in that (1) both were about an untimely diagnosis of an existing pregnancy, (2) both dealt with the claimed

injury of the inability to abort, (3) both involved mothers who claimed they would have had an abortion but for the delayed diagnosis, (4) both required the trier of fact to find that the mother could not obtain an abortion when the correct diagnosis was made, and (5) both would result in the parents retaining all the benefits of parenthood. *Flint*, 254 Wis. 2d 772, ¶ 21. The affirmative act taken to permanently prevent pregnancy, which distinguished *Marciniak*, was not present. *Flint*, 254 Wis. 2d 772, ¶ 21. Like Rieck, "Flint had only an interest in an ability to choose to abort her pregnancy" rather than "an interest in permanently avoiding conception." *Id.*, ¶ 22. The court noted that the size of the damage award, coupled with the hypothetical nature of the claimed desire to abort an ongoing pregnancy, could tempt parents "either to invent an intent to prevent pregnancy or at least to deny any possibility of a change of mind or attitude about continuation of the pregnancy." *Id.* The court declined to address the public policy of allowing recovery for Flint's own personal injuries related to the pregnancy, reasoning that "the incitements to fraud are much less likely when the alleged damages result from defined personal injuries rather than from the financial costs of raising a healthy child." *Id.*, ¶ 25. The court remanded for trial on Flint's claimed personal injuries. *Id.*, ¶¶ 25–26.

¶ 14. Significantly, the *Flint* court also noted that the costs of raising a healthy child would not be available for a negligence claim based on the doctor's failure to inform Flint of the possibility of becoming pregnant. *Id.*, ¶ 9 n.2. Flint had pursued such a claim before the circuit court. *Id.*, ¶¶ 8–9. However, the parties stipulated to defer consideration of this claim on appeal, with the understanding that it would rise or fall based on the outcome of the failure to diagnose claim.

*Id.*, ¶ 9 n.2. The court of appeals noted that, on remand, insofar as Flint sought to recover the costs of raising the child (as compared to deterioration of her health), the failure to inform claim would also fail because it was not based on a claim of negligent sterilization. *Id.*

**Recoverability of the Cost of Raising Nell's Child**

¶ 15. Under the facts of this case, the analysis set forth by the supreme court in *Marciniak* precludes Nell's recovery. We base our decision on the fifth public policy factor: "allowance of recovery would be too likely to open the way for fraudulent claims." *Marciniak*, 153 Wis. 2d at 65 (quoting *Rieck*, 64 Wis. 2d at 517). The crucial distinction between *Marciniak* and *Rieck* and *Flint* was Marciniak's permanent sterilization surgery. While Nell sought to avoid pregnancy, like Marciniak, she did so only on a temporary basis. Nell does not claim that she never wanted to have another baby; she took no steps to permanently prevent pregnancy. As in *Rieck* and *Flint*, her case is not about an "interest in permanently avoiding conception." *Flint*, 254 Wis. 2d 772, ¶ 22. So the question becomes whether we recognize these damages when she claims an interest in temporarily avoiding conception.

¶ 16. A comparison with *Flint* is instructive. Flint presented compelling facts to demonstrate her legitimate desire not to become pregnant—her own lupus-impaired health, her previous abortion, her apparent belief that she could not become pregnant based on the diagnosis of ovarian failure. Yet despite these facts lending trustworthiness to Flint's claim that she wanted to avoid pregnancy, we followed *Rieck* and denied recovery. *Flint*, 254 Wis. 2d 772, ¶ 22. Even with the health problems

present in *Flint*, we concluded that the "potential size of such a damage award, when tied to a hypothetical desire to abort . . ., comes squarely within *Rieck*'s concern that parents in similar circumstances would be tempted . . . to deny any possibility of a change of mind or attitude . . . when pregnancy was discovered." *Flint*, 254 Wis. 2d 772, ¶ 22. The *Flint* court distinguished Flint's claim from that of Marciniak's because "Flint took no steps to obtain a sterilization to permanently prevent pregnancy." *Id.* There was no room for a fraudulent claim in *Marciniak*; surgical sterilization provided an objective guarantee that the mother truly wanted to permanently avoid pregnancy.

¶ 17. Nell claims that her use of birth control pills manifests that same desire to prevent pregnancy evident in *Marciniak*, even if she only sought to temporarily avoid pregnancy. But if the circumstances in *Flint* did not provide a sufficient guarantee of trustworthiness, Nell's claim does not either. Nell was young and, as far as we know, healthy when she became pregnant and delivered her healthy baby. Nell's case presents the same opportunities for fraud as in *Rieck* and *Flint*. Claims of inadequate directions, wrong pills or any ineffectiveness of the chosen contraceptive method provide too many avenues for a parent to invent an intent to prevent pregnancy or deny "any possibility of change of mind or attitude." *Rieck*, 64 Wis. 2d at 519. Just as with the alleged failure to inform about the possibility of pregnancy, a patient who gets the wrong pills could change her mind at any time. As the *Flint* court concluded, whether the alleged intent to avoid the pregnancy is prior to conception or during an ongoing pregnancy, the public policy concern with fraud, given the potential size of the damage award, is the same.

Nell did not seek permanent surgical sterilization and therefore her claim for the costs of raising her child is barred by public policy.[2]

## Nell's Claimed Damages Other than the Cost of Raising Her Child

■

¶ 18. In addition to the costs of raising her child, Nell claims damages for pain and suffering, loss of future earning capacity, and postpartum depression. Nell's only argument as to why these damages are recoverable is that they are "directly related to the negligence of the [C]linic in providing the wrong pre-scribed medication to the plaintiff, just as any other damages caused by the negligent act of a tortfeasor." The Clinic responds that these damages fail on every one of the six public policy grounds, in particular the concern for fraudulent claims and the lack of any sensible or just stopping point.

¶ 19. In *Flint*, the court remanded for a full public policy analysis of Flint's personal injury damages "relat-

---

[2] The parties did not bring to our attention any case holding that a parent can recover as damages the costs of raising a healthy child born after a medical provider has negligently failed to provide prescribed birth control pills. Our independent research has not found any good law so holding. 70 C.J.S. *Physicians and Surgeons* § 161 (2012) states: "Damages recoverable in wrongful conception or wrongful pregnancy cases are generally limited to those caused by the negligently unsuccessful sterilization procedure and the resultant pregnancy." The only case we found to the contrary has been overruled. *See Troppi v. Scarf*, 187 N.W.2d 511 (Mich. App. 1971), *declined to follow by Rouse v. Wesley*, 494 N.W.2d 7, 10–11 (Mich. App. 1992), *overruling recognized by Taylor v. Kurapati*, 600 N.W.2d 670, 681 & n.34; (Mich. App. 1999); *see also* MICH. COMP. LAWS ANN. § 600.2971 (West 2012) (limiting actions for wrongful birth to those for intentional or grossly negligent acts or omissions).

ing to the deterioration of Flint's health." *Flint*, 254 Wis. 2d 772, ¶¶ 25–26. Flint suffered from lupus and was referred to the defendant doctor for lupus-related issues. *Id.*, ¶ 2. She underwent an abortion "for personal and medical reasons." *Id.* The doctor later failed to timely diagnose her pregnancy; Flint gave birth to a healthy baby, but during her pregnancy she discontinued her lupus medication. *Id.*, ¶¶ 5–6. After the birth, Flint suffered a decrease in kidney function, resulting in renal failure and a kidney transplant. *Id.*, ¶ 6. The court held that these damages, as compared to those related to the costs of raising a child, were much less likely to be fraudulent. *Id.*, ¶ 25. "[I]t is unlikely that a plaintiff would undergo a kidney transplant without a medical need for that procedure." *Id.*, ¶ 25. Flint would still have to prove that the deterioration in her health was due to the doctor's negligent failure to diagnose her pregnancy, that it was too late to abort when the pregnancy was diagnosed, that she would have aborted but for the late diagnosis and that the doctor's negligence was a substantial factor in her decline in health. *See id.* And, even if she could show this link between the doctor's negligence and her personal injuries, Flint's health deterioration damages might be precluded on public policy grounds. *Id.* But "the damages claimed are different from damages for raising a healthy child because they are for personal injuries due to a missed diagnosis such as are commonly associated with medical malpractice." *Id.* The *Flint* court, on the facts before it, could not conclude that Flint's claim for damages related to the deterioration of her health was barred by public policy. *Id.*

¶ 20. Like Flint, Nell claims damages for both the cost of raising her healthy child and for her own personal injuries she claims resulted from the Clinic's negligence. As discussed above, the costs of raising

Nell's healthy son are precluded on public policy grounds. Nell's own injuries, however, might survive a public policy analysis because they are more akin to those commonly associated with a medical malpractice claim. Nell must prove that her claimed damages are due to the Clinic's negligent provision of prenatal vitamins instead of birth control pills and that the Clinic's negligence was a substantial factor in causing her personal injuries. Even if Nell proves causal negligence, public policy could still preclude liability. We decline to make a determination on the viability of Nell's claimed personal injury damages prior to the benefit of further proceedings. *See id.*, ¶ 25 & n.7 (when the facts are not fully presented, it may be desirable for the court to allow further discovery or a full trial before making a public policy determination). Thus, regarding Nell's own claimed personal injuries related to the Clinic's alleged negligence and her resulting pregnancy, we reverse the circuit court "insofar as its decision precludes proof of [Nell's] claim for medical malpractice relating to these damages." *See id.*, ¶ 25.

## CONCLUSION

¶ 21. Here, Nell seeks damages for the cost of raising her child from a pregnancy caused by the negligent provision of prenatal vitamins when birth control pills were prescribed and damages allegedly resulting from the pregnancy. This is not a permanent sterilization case, and the costs of raising the child are therefore barred by public policy. We remand for further proceedings regarding Nell's own personal injuries.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions.