Joel HIRSCHHORN and Evelyn F. Hirschhorn,
Plaintiffs-Appellants,

v.

AUTO-OWNERS INSURANCE COMPANY,
Defendant-Respondent-Petitioner.†

Supreme Court

*No. 2009AP2768. Oral argument October 5, 2011.
—Decided March 6, 2012.*

2012 WI 20

(Also reported in 809 N.W.2d 529.)

† Motion for Reconsideration filed 4/20/12.

For the defendant-respondent-petitioner there were briefs by *Timothy M. Barber* and *Arthur E. Kurtz* and *Axley Brynelson,* Madison and oral argument by *Timothy M. Barber.*

For the plaintiff-appellant there was a brief by *Joel Hirschhorn* and *Hirschhorn & Bieber, P.A.,* Coral Gables and oral argument by *Joel Hirschhorn.*

An amicus curiae brief was filed by *Dan Kennedy and Beth E. Hanan, Gass Weber Mullins LLC,* Milwaukee, for Wisconsin Defense Counsel.

¶ 1. ANNETTE KINGSLAND ZIEGLER, J. This is a review of a published decision of the court of appeals, *Hirschhorn v. Auto-Owners Insurance Co.,* 2010 WI App 154, 330 Wis. 2d 232, 792 N.W.2d 639, that reversed a judgment entered by the Oneida County Circuit Court[1] dismissing Joel and Evelyn F. Hirschhorn's (collectively, the Hirschhorns) complaint against their homeowners insurer, Auto-Owners Insurance Company (Auto-Owners). The Hirschhorns filed suit against Auto-Owners for breach of contract and bad faith, claiming that Auto-Owners was liable for the total loss of their vacation home. The Hirschhorns alleged that their

vacation home became uninhabitable and unsaleable as a result of the accumulation of bat guano[2] between the home's siding and walls.

¶ 2. Auto-Owners moved for summary judgment, which the circuit court initially denied. Upon reconsideration, however, the circuit court agreed with Auto-Owners that its insurance policy's pollution exclusion clause excluded coverage for the Hirschhorns' loss. The court of appeals reversed, concluding that the pollution exclusion clause is ambiguous and therefore must be construed in favor of coverage.

¶ 3. We granted Auto-Owners' petition for review and now reverse the decision of the court of appeals.

¶ 4. We conclude that the pollution exclusion clause in Auto-Owners' insurance policy excludes coverage for the loss of the Hirschhorns' home that allegedly resulted from the accumulation of bat guano. First, we conclude that bat guano falls unambiguously within the policy's definition of "pollutants." Second, we conclude that the Hirschhorns' alleged loss resulted from the "discharge, release, escape, seepage, migration or dispersal" of bat guano under the plain terms of the policy's pollution exclusion clause. Accordingly, the circuit court properly dismissed the Hirschhorns' complaint against Auto-Owners.

## I. FACTUAL BACKGROUND

¶ 5. The facts of this case are few and undisputed. Beginning in 1981, the Hirschhorns owned a vacation

---

[2] "Guano" is defined as "[a] substance composed chiefly of the dung of sea birds or bats, accumulated along certain coastal areas or in caves and used as fertilizer." *The American Heritage Dictionary of the English Language* 802 (3d ed. 1992). For purposes of this opinion, we assume that guano includes both feces and urine.

home in the town of Lake Tomahawk, Wisconsin. At all relevant times, the home was covered by a homeowners insurance policy issued by Auto-Owners. The policy insured the home itself, along with structures and personal property located at the insured premises, against "accidental direct physical loss." However, relevant to this case, the policy contained a pollution exclusion clause that excluded from coverage any "loss resulting directly or indirectly from: . . . discharge, release, escape, seepage, migration or dispersal of pollutants . . . ." The policy, in turn, defined "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, liquids, gases and waste. Waste includes materials to be recycled, reconditioned or reclaimed."

¶ 6. Since 1981, at least once or twice each month, the Hirschhorns arranged for a neighbor or hired cleaner to access their vacation home to inspect it, confirm that no damage had been done in the Hirschhorns' absence, and clean and perform maintenance as necessary. During that time, bat guano was never found in the home.

¶ 7. In May 2007, Joel Hirschhorn met with a real estate broker to list the home for sale. At that time, the broker inspected the home and saw no signs of bats. However, in July 2007, upon inspecting the home again, the broker discovered the presence of bats and bat guano. The broker attempted to remove the bats and clean the home, to no avail.

¶ 8. The Hirschhorns and their family stayed at their vacation home between August 9 and 14, 2007. During their stay, they noticed a "penetrating and offensive odor emanating from the home." Upon leaving on August 14, 2007, they arranged for a contractor to

conduct a more thorough inspection of the home. The contractor determined that the cause of the odor was the accumulation of bat guano between the home's siding and walls. The contractor provided the Hirschhorns a remediation estimate but could not guarantee that cleaning up the bat guano would rid the home of its odor.

¶ 9. Subsequently, on October 23, 2007, the Hirschhorns filed with Auto-Owners a notice of property loss. The notice described the loss as resulting from the discovery of bats in the Hirschhorns' home and specifically stated, "smell awful and [insured] cannot stay in house . . . ." Auto-Owners denied the claim three days later, reasoning that the accumulation of bat guano was "not sudden and accidental" and, in any case, resulted from "faulty, inadequate or defective" maintenance within the terms of the policy's maintenance exclusion clause.

¶ 10. On November 4, 2007, the Hirschhorns entered into a contract with a builder to demolish their existing vacation home and construct a new one in its place. In his affidavit, Joel Hirschhorn explained that he thought it was more practical financially to demolish the home than to spend the money to make it habitable again.

¶ 11. After the home's demolition, on February 22, 2008, Auto-Owners sent to the Hirschhorns a revised denial letter. Auto-Owners denied the Hirschhorns' claim on the additional ground that "[b]at guano is considered a pollutant" within the terms of the policy's pollution exclusion clause.

## II. PROCEDURAL POSTURE

¶ 12. On May 15, 2008, the Hirschhorns filed suit against Auto-Owners for breach of contract and bad

faith, claiming that Auto-Owners was liable for the total loss of their vacation home. The complaint alleged that the Hirschhorns' home "became uninhabitable and unsaleable due to the penetrating and offensive odor" of bat guano accumulated between the home's siding and walls. The complaint further alleged that "the drapes, carpets, fabrics and fabric furnishings in the home were rendered unusable as a result of the absorption of the bat guano odor." Taking into account the value of the home itself, a free-standing garage, and their personal property, the Hirschhorns sought compensatory damages of $308,500, plus interest; punitive damages; and attorney fees and costs.

¶ 13. Auto-Owners moved for summary judgment, arguing that its insurance policy did not provide coverage for the Hirschhorns' loss. Specifically, Auto-Owners maintained that the accumulation of bat guano in the Hirschhorns' vacation home was predictable and therefore did not result in an accidental loss, as required by the policy's initial grant of coverage. Alternatively, even if the Hirschhorns' loss fell within the policy's initial grant of coverage, Auto-Owners argued that coverage was nevertheless excluded under three separate exclusions: a maintenance exclusion clause, a vermin exclusion clause, and a pollution exclusion clause. First, Auto-Owners contended that the loss resulted from "faulty, inadequate or defective maintenance," namely, the Hirschhorns' inadequate upkeep of the home's siding, resulting in hundreds of access points for bats. Second, Auto-Owners argued that the loss resulted from "vermin," a category of noxious pests that reasonably includes bats. Third and finally, Auto-Owners argued that the loss resulted from the odorous discharge of "pollutants," a term that, as defined by the policy, reasonably encompasses bat guano.

¶ 14. In an oral ruling on April 6, 2009, the circuit court initially denied Auto-Owners' motion for summary judgment. At the outset, the circuit court concluded that the Hirschhorns' loss constituted an "accidental direct physical loss" within the terms of the policy's initial grant of coverage. The court rejected Auto-Owners' argument that the accumulation of bat guano was predictable, explaining that the Hirschhorns could not reasonably have anticipated that bats would infest their vacation home to the point of total destruction.

¶ 15. Next, the circuit court determined that none of the three specified exclusion clauses applied. The court viewed the Hirschhorns' loss as a result of an "apparent structural defect," as opposed to inadequate maintenance. In addition, the court concluded that bats do not unambiguously qualify as "vermin" and so construed the vermin exclusion clause in favor of coverage. Lastly, the circuit court determined that the pollution exclusion clause did not apply to these facts, reasoning that bat guano accumulating inside the home is unlike "traditional pollution":

> When we talk about pollution, it's usually a leakage or a seeping from a polluted area into some other area causing damage. And we don't have that same situation here. We have the damage actually being caused by things coming into the structure and the deposit being actually made in the structure, which isn't the same as the traditional pollution cases.

¶ 16. Auto-Owners moved the circuit court for reconsideration, arguing, *inter alia,* that the court failed to apply the proper analytical framework to the pollution exclusion clause.

¶ 17. The circuit court agreed. On September 18, 2009, the court granted Auto-Owners' motion for recon-

sideration, concluding that the pollution exclusion clause in Auto-Owners' policy excluded coverage for the Hirschhorns' loss.[3] Guided by this court's analysis of a similar pollution exclusion clause in *Peace v. Northwestern National Insurance Co.,* 228 Wis. 2d 106, 596 N.W.2d 429 (1999), the circuit court concluded that bat guano qualifies as a "pollutant," the odor of which "seeped or . . . disbursed throughout the residence to cause the loss." Accordingly, the court ruled that the Hirschhorns' loss was not covered under Auto-Owners' insurance policy and, as a result, entered judgment dismissing their complaint.

¶ 18. The Hirschhorns appealed, and the court of appeals reversed. *Hirschhorn,* 330 Wis. 2d 232. The court of appeals concluded that the pollution exclusion clause in Auto-Owners' insurance policy is ambiguous and therefore must be construed in favor of coverage. *Id.,* ¶ 1. Analogizing bat guano to exhaled carbon dioxide as considered by this court in *Donaldson v. Urban Land Interests, Inc.,* 211 Wis. 2d 224, 564 N.W.2d 728 (1997), the court of appeals explained that a reasonable insured might interpret the term "pollutants" as not including bat guano. *Hirschhorn,* 330 Wis. 2d 232, ¶ 10. Considering the policy's enumerated "pollutants," the court remarked that "waste" is the only exemplar that suggests bat guano. *Id.,* ¶ 12. While "waste *can* mean excrement," the court of appeals reasoned, "in the context it is presented here, when a person reading the definition [of 'pollutants'] arrives at

---

[3] The circuit court declined to reverse its initial conclusions that the Hirschhorns' loss fell within the policy's initial grant of coverage and that the maintenance and vermin exclusion clauses did not apply. Auto-Owners opted not to challenge those conclusions on appeal, and accordingly, we do not address them further.

the term 'waste,' poop does not pop into one's mind." *Id.* Moreover, the court of appeals determined that the terms "pollutants" and "waste" are further circumscribed by the language of the pollution exclusion clause itself, "which omits coverage for the 'discharge, release, escape, seepage, migration or dispersal of pollutants.' " *Id.*, ¶ 15. According to the court of appeals, none of those terms suggests a biological process such as the movement of excrement. *Id.* "Therefore, because a person might reasonably interpret the pollution exclusion as not contemplating bat guano," the court of appeals concluded that Auto-Owners' policy did not exclude coverage for the Hirschhorns' loss.

¶ 19. Auto-Owners petitioned this court for review, which we granted on March 16, 2011.

## III. STANDARD OF REVIEW

¶ 20. In this case, the circuit court granted Auto-Owners' motion for reconsideration of the court's order denying Auto-Owners' motion for summary judgment. We review summary judgment rulings independently, applying the well-established standards set forth in Wis. Stat. § 802.08 (2007–08).[4] *Siebert v. Wis. Am. Mut. Ins. Co.*, 2011 WI 35, ¶ 27, 333 Wis. 2d 546, 797 N.W.2d 484; *Peace*, 228 Wis. 2d at 119; *Donaldson*, 211 Wis. 2d at 229–30. Summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." § 802.08(2).

---

[4] All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

¶ 21. Here, the parties do not dispute the material facts giving rise to the Hirschhorns' loss. Rather, the sole issue is whether the pollution exclusion clause in Auto-Owners' insurance policy excludes coverage for the loss of the Hirschhorns' home that allegedly resulted from the accumulation of bat guano. The interpretation of an insurance policy is a question of law that we review de novo. *Siebert,* 333 Wis. 2d 546, ¶ 28.

## IV. ANALYSIS

¶ 22. Our goal in interpreting an insurance policy, like our goal in interpreting any contract, is to ascertain and carry out the parties' intentions. *Id.,* ¶ 31; *Peace,* 228 Wis. 2d at 120–21. To that end, we interpret policy language according to its plain and ordinary meaning as understood by a reasonable person in the position of the insured. *Siebert,* 333 Wis. 2d 546, ¶ 31; *Zarder v. Humana Ins. Co.,* 2010 WI 35, ¶ 26, 324 Wis. 2d 325, 782 N.W.2d 682; *Peace,* 228 Wis. 2d at 121.

¶ 23. Words or phrases in an insurance policy are ambiguous if they are fairly susceptible to more than one reasonable interpretation. *Zarder,* 324 Wis. 2d 325, ¶ 26; *Peace,* 228 Wis. 2d at 121; *Donaldson,* 211 Wis. 2d at 231. If we determine that the policy language is ambiguous, our construction is "quite constrained" by the doctrine of *contra proferentem:*[5] ambiguities are construed against the insurer, the drafter of the policy.

---

[5] *Contra proferentem* is Latin for "against the offeror." *Black's Law Dictionary* 328 (7th ed. 1999); *see also Donaldson v. Urban Land Interests, Inc.,* 211 Wis. 2d 224, 230 & n.3, 564 N.W.2d 728 (1997).

*State Farm Mut. Auto. Ins. Co. v. Langridge,* 2004 WI 113, ¶ 46, 275 Wis. 2d 35, 683 N.W.2d 75; *see also Zarder,* 324 Wis. 2d 325, ¶ 27. However, this does not mean that we must embrace any grammatically plausible interpretation created by an insured for purposes of litigation. *Langridge,* 275 Wis. 2d 35, ¶ 46. "The tenets of insurance policy construction provide that there is ambiguity where a policy is susceptible to more than one *reasonable* interpretation." *Id.,* ¶ 48. Likewise, the mere fact that a word has more than one dictionary definition, or that the parties disagree as to its meaning, does not render the word ambiguous if only one meaning comports with an insured's objectively reasonable understanding. *See id.,* ¶ 41; *Peace,* 228 Wis. 2d at 136; *Landshire Fast Foods of Milwaukee, Inc. v. Emp'rs Mut. Cas. Co.,* 2004 WI App 29, ¶ 16, 269 Wis. 2d 775, 676 N.W.2d 528; *Richland Valley Prods., Inc. v. St. Paul Fire & Cas. Co.,* 201 Wis. 2d 161, 168–69, 548 N.W.2d 127 (Ct. App. 1996).

¶ 24. Absent a finding of ambiguity, we will not apply rules of construction to rewrite an insurance policy to bind an insurer to a risk it did not contemplate and for which it did not receive a premium. *See Siebert,* 333 Wis. 2d 546, ¶ 31; *Peace,* 228 Wis. 2d at 121 ("[T]his principle [of *contra proferentem*] does not allow a court to eviscerate an exclusion that is clear from the face of the insurance policy."); *Donaldson,* 211 Wis. 2d at 231 ("Absent a finding of ambiguity, this court will not use the rules of construction to rewrite the language of an insurance contract.").

¶ 25. In this case, we are asked to determine whether the pollution exclusion clause in Auto-Owners' insurance policy excludes coverage for the loss of the Hirschhorns' home that allegedly resulted from the

accumulation of bat guano. The pollution exclusion clause excludes from coverage any "loss resulting directly or indirectly from: . . . discharge, release, escape, seepage, migration or dispersal of pollutants . . . ." The policy defines "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, liquids, gases and waste. Waste includes materials to be recycled, reconditioned or reclaimed." Accordingly, to resolve the issue before us, we must first determine whether bat guano falls unambiguously within the policy's definition of "pollutants." If it does, we must then determine whether the Hirschhorns' alleged loss resulted from the "discharge, release, escape, seepage, migration or dispersal" of bat guano under the plain terms of the policy's pollution exclusion clause. In order for the pollution exclusion clause to apply, both inquiries must be answered in the affirmative. *See Peace,* 228 Wis. 2d at 119; *Donaldson,* 211 Wis. 2d at 229. We analyze them in turn.

A

¶ 26. First, we must determine whether bat guano falls unambiguously within the policy's definition of "pollutants." We conclude that it does.

¶ 27. Again, Auto-Owners' insurance policy defines "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, liquids, gases and waste. Waste includes materials to be recycled, reconditioned or reclaimed." In other words, under the policy, a pollutant includes (1) any solid, liquid, gaseous, or thermal irritant; or (2) any solid, liquid, gaseous, or thermal contaminant. *See Peace,* 228 Wis. 2d at 122. Moreover, relevant to this case, the policy lists waste as one such irritant or contaminant.

¶ 28. The policy does not further define "irritant," "contaminant," or "waste." Accordingly, pursuant to our rules governing insurance policy interpretation, we construe these terms according to their plain and ordinary meanings as understood by a reasonable person in the position of the insured, in this case, homeowners. *See Siebert,* 333 Wis. 2d 546, ¶ 31.

¶ 29. Our decisions in *Donaldson* and *Peace* are instructive. In both cases, this court had the occasion to construe the terms "irritant" and "contaminant" in the context of nearly identical pollution exclusion clauses.

¶ 30. First, in *Donaldson,* this court held that the pollution exclusion clause did not exclude coverage for the plaintiffs' personal injury claims arising out the inadequate ventilation of exhaled carbon dioxide in their office building. 211 Wis. 2d at 227. The court reasoned that a reasonable insured would not necessarily understand the policy's definition of "pollutant" to include exhaled carbon dioxide. *Id.* at 233–34. As the court recognized, the definition of "pollutant" was undeniably broad: " '[t]he terms 'irritant' and 'contaminant,' when viewed in isolation are virtually boundless, for there is virtually no substance or chemical in existence that would not irritate or damage some person or property.' " *Id.* at 232 (quoting *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.,* 976 F.2d 1037, 1043 (7th Cir. 1992)). Consequently, the court cautioned that "[t]he reach of the pollution exclusion clause must be circumscribed by reasonableness," lest everyday incidents be characterized as pollution and "the contractual promise of coverage be reduced to a dead letter." *Id.* at 233. In that case, the court explained that exhaled carbon dioxide, while potentially harmful in a confined and poorly ventilated area, is "universally present and generally harmless." *Id.* at 234. Accordingly, the court

could not conclude that a reasonable insured would necessarily view exhaled carbon dioxide as a "pollutant." *Id.*

¶ 31. Two years later, in *Peace,* this court held that the pollution exclusion clause excluded coverage for the minor plaintiff's personal injury claims arising out of his ingestion of lead-based paint chips, flakes, and dust present in the insured's apartment. 228 Wis. 2d at 110–11. The court concluded that lead present in paint fell plainly within the insurance policy's definition of "pollutants." *Id.* at 121–22. Consulting a non-legal dictionary, the court determined that the ordinary meaning of "contaminant" is "one that contaminates" or " 'make[s] impure or unclean by contact or mixture.' " *Id.* at 122 (quoting *The American Heritage Dictionary of the English Language* 406 (3d ed. 1992) [hereinafter *American Heritage Dictionary*]). The court further determined that the ordinary meaning of "irritant" is a "source of irritation, especially physical irritation," as in " '[a] condition of inflammation, soreness, or irritability of a bodily organ or part.' " *Id.* (quoting *American Heritage Dictionary* 954). Applying these definitions to the plaintiff's claims, the court concluded that "[t]here is little doubt that lead derived from lead paint chips, flakes, or dust is an irritant or serious contaminant." *Id.* at 125. As the court explained, the physical consequences of lead paint used in a home are well-documented: "Lead poisoning from paint at residential properties is generally caused by the inhalation of lead-contaminated dust particles or toxic lead fumes through respiration or the ingestion of lead-based paint chips by mouth." *Id.* at 123.

¶ 32. The *Peace* court contrasted its decision with that in *Donaldson,* explaining that unlike exhaled carbon dioxide, lead paint chips, flakes, and dust "are widely,

if not universally, understood to be dangerous . . . ." *Id.* at 137; *see also id.* at 150 ("[T]he act of human breathing is in sharp contrast to the peeling of lead paint from residential surfaces. Lead is a substance that has been recognized for centuries as harmful. It is a substance that is heavily restricted by the modern regulatory state.") (Bradley, J., concurring). Because "[t]he toxic effects of lead have been recognized for centuries," the *Peace* court concluded that a reasonable person in the position of the insured, an owner of rental property, would consider lead present in paint to be a pollutant. *Id.* at 137–38.

¶ 33. Turning back to the instant case, we conclude that bat guano falls unambiguously within the term "pollutants" as defined by Auto-Owners' insurance policy. Bat guano, composed of bat feces and urine, is or threatens to be a solid, liquid, or gaseous irritant or contaminant. That is, bat guano and its attendant odor " 'make impure or unclean' " the surrounding ground and air space, *see id.* at 122 (quoting *American Heritage Dictionary* 406), and can cause " 'inflammation, soreness, or irritability' " of a person's lungs and skin, *see id.* (quoting *American Heritage Dictionary* 954). *See* Wis. Dep't of Health & Family Servs. in cooperation with the Agency for Toxic Substances & Disease Registry, *Indoor Air and Health Issues: Bat Guano, Antigo, Langlade County, Wisconsin* (June 9, 1998), http://www.atsdr. cdc. gov/hac/pha/batg/bat_toc.html (concluding that "[p]eople who live around large quantities of bat wastes are more likely to become ill with histoplasmosis"; "[p]eople who contact mites that live in bat wastes may get skin rashes"; and "[m]olds that grow in moist, warm, highly organic situations may increase asthma attacks in affected people"). These points cannot be seriously contested by the Hirschhorns, who alleged in their com-

plaint that the odor of bat guano was so "penetrating and offensive" as to render their vacation home unfit to live in.

¶ 34. Our conclusion that bat guano unambiguously constitutes an "irritant" or "contaminant" is buttressed by the fact that the policy explicitly lists "waste" as one such irritant or contaminant. The noun "waste" is defined as, among other things, "[t]he undigested residue of food eliminated from the body; excrement." *American Heritage Dictionary* 2016. To be sure, as the Hirschhorns point out, "waste" has several other dictionary definitions, including "[t]he act or an instance of wasting or the condition of being wasted"; "[a] place, region, or land that is uninhabited or uncultivated"; "[a] devastated or destroyed region, town, or building"; "[a] useless or worthless byproduct, as from a manufacturing process"; and "[g]arbage, trash." *Id.* However, the mere fact that "waste" has more than one dictionary definition, or that the parties may disagree as to its meaning, does not necessarily make the word ambiguous. *See Langridge,* 275 Wis. 2d 35, ¶ 41. Rather, our primary inquiry is whether a reasonable person in the position of the insured would understand bat guano to be waste. *See Siebert,* 333 Wis. 2d 546, ¶ 31. The answer is yes. Bat guano is composed of bat feces and urine. Feces and urine are commonly understood to be waste. Indeed, the ordinary meaning of "feces" is "[w]aste matter eliminated from the bowels; excrement," *American Heritage Dictionary* 668, and the ordinary meaning of "urine" is "[t]he waste product secreted by the kidneys . . . ," *id.* at 1965.[6]

---

[6] Interestingly, in their response brief, the Hirschhorns concede that "[a] reasonable insured may understand the pollution exclusion to include human excrement." They fail to explain,

778

¶ 35. Still, the Hirschhorns argue, and the court of appeals agreed, that the term "waste" does not necessarily call to mind feces and urine, given the policy's other examples of irritants and contaminants, namely, "smoke, vapor, soot, fumes, acids, alkalis, chemicals, liquids, [and] gases." *See Hirschhorn,* 330 Wis. 2d 232, ¶¶ 12–14. Invoking the *ejusdem generis*[7] rule of construction, the court of appeals determined that the interpretation of "waste," an otherwise broad term, should be limited to "damaged, defective, or superfluous material produced during or left over from a manufacturing process or industrial operation," consistent with the industrial and chemical nature of the other listed examples. *Id.,* ¶ 13 (internal quotations omitted). However, we have already concluded that the term "waste" unambiguously includes feces and urine. That being the case, we will not apply rules of construction to rewrite the plain terms of the policy's definition of "pollutants." *See Donaldson,* 211 Wis. 2d at 231; *Richland Valley Prods.,* 201 Wis. 2d at 173. Moreover, in *Peace,* this court already rejected the argument that the pollution exclusion clause should apply to only industrial-type pollutants. *See* 228 Wis. 2d at 138–44.

¶ 36. Relatedly, the Hirschhorns also argue that a reasonable insured would not necessarily understand the term "waste" to include feces and urine, given the policy's explanation that "[w]aste includes materials to

however, why the policy's definition of "pollutants" should be interpreted differently for feces and urine specific to bats.

[7] *Ejusdem generis* is Latin for "of the same kind or class" and refers to the rule of construction that "when a general word or phrase follows a list of specific persons or things, the general word or phrase will be interpreted to include only persons or things of the same type as those listed." *Black's Law Dictionary* 535 (7th ed. 1999).

be recycled, reconditioned or reclaimed." The Hirschhorns reason that "[n]othing about those three words relates in any way to excrement." While that may be true, the policy does not limit the term "waste" *only* to materials to be recycled, reconditioned or reclaimed; rather, the policy merely clarifies that waste "includes" materials to be recycled, reconditioned or reclaimed. When a list of terms follows the word "includes," the list is commonly understood to be non-exhaustive. *See Weber v. Town of Saukville,* 209 Wis. 2d 214, 226, 562 N.W.2d 412 (1997). In this case, because the term "waste" denotes a condition of being wasted, as in useless, it makes sense that Auto-Owners wished to clarify that, for purposes of the pollution exclusion clause, "waste" may include material to be used again.

¶ 37. Finally, our conclusion that bat guano falls unambiguously within the term "pollutants" as defined by Auto-Owners' insurance policy is consistent with our prior decisions in *Donaldson* and *Peace.* Unlike exhaled carbon dioxide, bat guano is not "universally present and generally harmless in all but the most unusual instances." *See Donaldson,* 211 Wis. 2d at 234. To the contrary, bat guano, like lead present in paint, is a unique and largely undesirable substance that is commonly understood to be harmful. *See Peace,* 228 Wis. 2d at 137–38. A reasonable homeowner would therefore understand bat guano to be a pollutant.

B

¶ 38. Our conclusion that bat guano falls unambiguously within the policy's definition of "pollutants" does not resolve this case. We still must determine whether the Hirschhorns' alleged loss resulted from the

"discharge, release, escape, seepage, migration or dispersal" of bat guano under the plain terms of the policy's pollution exclusion clause. We conclude it did.

¶ 39. The pollution exclusion clause in Auto-Owners' insurance policy excludes from coverage any "loss resulting directly or indirectly from: . . . discharge, release, escape, seepage, migration or dispersal of pollutants . . . ." We have already concluded that bat guano constitutes a pollutant. Accordingly, the remaining inquiry is whether the Hirschhorns' alleged loss, the loss of their vacation home, resulted from the "discharge, release, escape, seepage, migration or dispersal" of bat guano.

¶ 40. The policy does not define "discharge," "release," "escape," "seepage," "migration," or "dispersal." Accordingly, as we did before, we construe these terms according to their plain and ordinary meanings as understood by a reasonable person in the position of the insured. *See Siebert,* 333 Wis. 2d 546, ¶ 31.

¶ 41. In *Peace,* this court explained that four of these terms, "discharge," "dispersal," "release," and "escape," "describe the entire range of actions by which something moves from a contained condition to an uncontained condition." 228 Wis. 2d at 126. For example, the noun "discharge" means "[s]omething that is discharged, released, emitted, or excreted." *American Heritage Dictionary* 530. Likewise, "dispersal" is "the condition of being dispersed," meaning "scatter[ed] in different directions" or "strew[n] or distribute[d] widely." *Id.* at 537. A "release" is defined as a "liberation," "[a]n unfastening or letting go . . . ." *Id.* at 1524. Finally, an "escape" is "[a] means of obtaining temporary freedom" or "[a] gradual effusion of an enclosure; a leakage." *Id.* at 625–26.

¶ 42. The two additional terms found in the pollution exclusion clause in Auto-Owners' policy, "seepage" and "migration," are similar still. "Seepage" is defined as "[t]he act or process of seeping," meaning to "ooze" or "[t]o enter, depart, or become diffused gradually." *Id.* at 1634. "Migration" means "[t]he act or an instance of migrating," as in moving from one location and settling in another. *Id.* at 1143.

¶ 43. As their definitions make clear, these six terms are often synonymous with one another and " 'taken together constitute a comprehensive description of the processes by which pollutants may cause injury to persons or property.' " *Peace,* 228 Wis. 2d at 127 (quoting *Emp'rs Cas. Co. v. St. Paul Fire & Marine Ins. Co.,* 52 Cal. Rptr. 2d 17, 23 (Cal. Ct. App. 1996)).

¶ 44. We applied these same terms in *Peace.* In that case, the court concluded that the plain language of the pollution exclusion clause excluded the minor plaintiff's claims for bodily injury that resulted from the ingestion of lead in paint that chips, flakes, or breaks down into dust or fumes. *Id.* at 130. The court explained that the pollutant lead, once contained on the painted surface, dispersed, discharged, or escaped from the containment, thereby becoming ingestible and causing the plaintiff's bodily injury. *See id.*

¶ 45. In addition, in *United States Fire Insurance Co. v. Ace Baking Co.,* 164 Wis. 2d 499, 504–05, 476 N.W.2d 280 (Ct. App. 1991), the court of appeals concluded that a similar pollution exclusion clause unambiguously excluded coverage for the loss of the insured manufacturer's ice cream cones that were fouled by fabric softener stored in the same warehouse. The fragrance softener contained a fragrance additive, linalool, that made the ice cream cones smell and taste like soap. *Id.* at 501. The court of appeals concluded that the

loss of ice cream cones was caused by the release, discharge, or dispersal of a pollutant, linalool, under the plain terms of the pollution exclusion clause. *Id.* at 505.

¶ 46. Similarly, in the case before us, we conclude that the alleged loss of the Hirschhorns' vacation home resulted from the "discharge, release, escape, seepage, migration or dispersal" of bat guano under the plain terms of the policy's pollution exclusion clause. The bat guano, deposited and once contained between the home's siding and walls, emitted a foul odor that spread throughout the inside of the home, infesting it to the point of destruction. The Hirschhorns acknowledged as much in their complaint. They alleged that "the drapes, carpets, fabrics and fabric furnishings in the home were rendered unusable as a result of the absorption of the bat guano odor." Accordingly, implicit in their complaint is an allegation that the bat guano somehow separated from its once contained location between the home's siding and walls and entered the air, only to be absorbed by the furnishings inside the home. *See Peace*, 228 Wis. 2d at 127–28. According to the Hirschhorns, the result was the total loss of their vacation home. Such an allegation falls squarely within the terms of the pollution exclusion clause.

## V. CONCLUSION

¶ 47. We conclude that the pollution exclusion clause in Auto-Owners' insurance policy excludes coverage for the loss of the Hirschhorns' home that allegedly resulted from the accumulation of bat guano. First, we conclude that bat guano falls unambiguously within the policy's definition of "pollutants." Second, we conclude that the Hirschhorns' alleged loss resulted from the "discharge, release, escape, seepage, migration or dispersal" of bat guano under the plain terms of the

policy's pollution exclusion clause. Accordingly, the circuit court properly dismissed the Hirschhorns' complaint against Auto-Owners.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 48. SHIRLEY S. ABRAHAMSON, C.J. (*dissenting*). It is firmly established that "words or phrases in an insurance policy are ambiguous if, when read in context, they are susceptible to more than one reasonable interpretation."[1] I agree with the court of appeals because it faithfully applied this standard, holding that "[o]ne could review the pollution exclusion as a whole and reasonably interpret 'pollutant' as not including bat guano excreted in a house."[2]

¶ 49. The majority, on the other hand, concludes that the pollution exclusion is unambiguous, majority op., ¶ 4, which means the majority believes that word "waste" in the policy's definition of "pollutants" is susceptible to only one reasonable interpretation.

¶ 50. One definition of "waste" is excrement. Guano is excrement. Majority op., ¶ 34. It simply does not follow, as the majority opinion asserts, that guano was unambiguously included as waste in the definition of "pollutants" in Auto-Owners' pollution exclusion clause.

¶ 51. As the majority acknowledges, the word "waste" has many meanings. Majority op., ¶ 34. The majority opinion explains that a word with multiple meanings is not ambiguous "if only one meaning com-

---

[1] *Donaldson v. Urban Land Interests, Inc.,* 211 Wis. 2d 224, 231, 564 N.W.2d 728 (1997).

[2] *Hirschhorn v. Auto-Owners Ins. Co.,* 2010 WI App 154, ¶ 10, 330 Wis. 2d 232, 792 N.W.2d 639.

ports with an insured's objectively reasonable understanding." Majority op., ¶ 23.

¶ 52. The majority then selects one meaning of the word "waste" from the dictionary to define "waste" in the policy. Ironically, to determine that its chosen dictionary definition of "waste" is the one used in the context of the insurance policy, the majority explicitly ignores context. Majority op., ¶ 35. In contrast, a reasonable insured would look to words surrounding "waste" to determine what "waste" means in this policy. The majority's refusal to consider context is baffling. How else but by considering the word "waste" in context would we determine which of the many meanings of "waste" is objectively reasonable?

¶ 53. The majority asserts that it will not use context to help interpret a word, since doing so would invoke a canon of construction, and canons of construction are not called upon until after a finding of ambiguity. Majority op., ¶ 35. This is a faulty application of the canons of contract interpretation.

¶ 54. The court of appeals did not refer to the *ejusdem generis* rule[3] to "rewrite the plain terms of the policy[ ]," as the majority suggests. Majority op., ¶ 35. Rather, the reference to *ejusdem generis* as used by the Hirschhorns was meant to illustrate why a reasonable insured might conclude that guano was not excluded by the pollution exclusion.

¶ 55. A reasonable insured reading the insurance policy would draw conclusions about the meaning of "waste" in light of the words that appear near it. This interpretive strategy underlies the *ejusdem generis* rule of construction, which is why the Hirschhorns invoked the rule and the court of appeals referred to it.

---

[3] *See Hirschhorn,* 330 Wis. 2d 232, ¶ 12.

¶ 56. In some contexts—for example, a rental agreement for portable toilets with a clause requiring the renter to dispose of all "waste" before returning the toilets—an objectively reasonable interpretation of the word "waste" would include excrement. In the context of the definition of "pollutant," when the word "waste" follows the words "smoke, vapor, soot, fumes, acids, alkalis, chemicals, liquids, [and] gasses," a reasonable insured might well conclude that "waste" does not encompass guano. The court of appeals suggests that when the word "excrement" is substituted in the policy for the word "waste," it is clear that the word "waste" is not like the other words. Nor do bat feces and urine come to mind when the policy declares that "waste includes materials to be recycled, reconditioned, or reclaimed."

¶ 57. In sum, instead of utilizing context to discern meaning, the majority uses a backward method. It first selects one dictionary definition from among many to define " 'waste' [as] unambiguously includ[ing] feces and urine." Majority op., ¶ 35. The majority's selected dictionary definition ends the discussion of the meaning of "waste." The majority's approach fails in several respects. It fails to read words in the insurance policy in context to discern their meaning; it fails to read the insurance policy from the perspective of a reasonable insured; and it fails to construe ambiguities against the drafter and in favor of coverage.

¶ 58. For the reasons stated above, I dissent.

¶ 59. I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.