Ron GUENTHER and Kathy Guenther, Plaintiffs-Co-Appellants,

v.

CITY OF ONALASKA, Defendant-Appellant,

CITIES & VILLAGES MUTUAL INSURANCE COMPANY, Defendant-Respondent.†

Court of Appeals

*No. 98–0724. Submitted on briefs September 4, 1998.—Decided November 19, 1998.*

(Also reported in 588 N.W.2d 375.)

†Petition to review denied.

On behalf of the plaintiffs-co-appellants, the cause was submitted on the briefs of *William G. Skemp* and *Sonja Davig Huesmann* of *William Skemp Law Firm, S.C.* of La Crosse.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Janet Jenkins* of *Johns & Flaherty, S.C.* of La Crosse.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Daniel E. Dunn* of *Smyth & Dunn* of La Crosse.

Before Vergeront, Roggensack and Deininger, JJ.

ROGGENSACK, J.  Ron and Kathy Guenther and the City of Onalaska (Onalaska) appeal from a summary judgment dismissing Onalaska's insurer, Cities and Villages Mutual Insurance Company (Mutual Insurance), from the Guenthers' lawsuit for damages incurred when an Onalaska sewer backed-up into the Guenthers' basement. The circuit court concluded that the backup was excluded from coverage under the policy's pollution exclusion clause and it dismissed the action against Mutual Insurance. We agree that the pollution exclusion could reasonably be interpreted as was done by the circuit court, however, we conclude that Onalaska could also have reasonably understood that the exclusion for "contamination . . . by pollutants" did not apply to an occurrence as routine as a domestic sewer backup, which caused at least some damages, which were unrelated to any toxic nature[1] of

---

[1] We cannot determine from the affidavits submitted in support of and in opposition to Mutual Insurance's motion for summary judgment whether there were toxic properties to this domestic sewage and whether any damages resulted from such toxic properties, if such were present. Those are questions of

the sewage. Therefore, we conclude the policy is ambiguous and we construe it in favor of coverage. Accordingly, we reverse and remand for further proceedings in the circuit court.

## BACKGROUND

In May, 1995, an Onalaska sewer backed-up into the basement of a flower shop owned by the Guenthers. The basement was flooded with twenty-six inches of water, human waste, and other debris. As a result of the flooding, the Guenthers lost inventory, office supplies and business documents which were stored in the basement. In addition, they had to replace the water heater, repair the furnace, repaint the basement floor, and replace the carpeting. Because the water which flooded their basement contained human waste, sludge and mud, it created a very unpleasant odor in the basement. Ron Guenther, in statements made under oath, said that the building "[s]tunk to high heaven" and smelled "[l]ike an outhouse." According to Ron, the basement still does not smell right even though it was professionally cleaned and deodorized.

The Guenthers filed a lawsuit against Onalaska and its insurer, Mutual Insurance, for damages to their property. Mutual Insurance filed a motion for summary judgment seeking dismissal of the action against it, claiming that the sewer backup constituted contamination by pol'ution, which was not covered under its policy. The circuit court agreed·and dismissed Mutual Insurance from the litigation. This appeal followed.

---

fact that are not appropriate for resolution on summary judgment.

## DISCUSSION

### Standard of Review.

This court reviews summary judgment decisions *de novo*, applying the same standards employed by the circuit court. *Smith v. Dodgeville Mut. Ins. Co.*, 212 Wis. 2d 226, 232, 568 N.W.2d 31, 34 (Ct. App. 1997). We first examine the complaint to determine whether it states a claim, and then review the answer, to determine whether it presents a material issue of fact or law. *Id.* If we determine that the complaint and answer are sufficient, we proceed to examine the moving party's affidavits, to determine whether they establish a *prima facie* case for summary judgment. *Id.* at 232–33, 568 N.W.2d at 34. If they do, we look to the opposing party's affidavits, to determine whether there are any material facts in dispute which entitle the opposing party to a trial. *Id.* at 233, 568 N.W.2d at 34.

Both parties look to the language of the insurance contract between Onalaska and Mutual Insurance to support their respective positions. Interpretation of a written insurance policy is a question of law which we review *de novo*, without deference to the decision of the circuit court. *Donaldson v. Urban Land Interests, Inc.*, 211 Wis. 2d 224, 230, 564 N.W.2d 728, 731 (1997).

### Pollution Exclusion.

The interpretation of insurance policies is governed by the same rules of construction that apply to other contracts. *Id.* Ambiguities in a policy's terms are

resolved in favor of coverage, while coverage exclusion clauses are narrowly construed against the insurer. *Id.*

> The principle underlying the doctrine is straightforward. As the drafter of the insurance policy, an insurer has the opportunity to employ expressive exactitude in order to avoid a misunderstanding of the policy's terms. Because the insurer is the party best situated to eliminate ambiguity in the policy, the policy's terms should be interpreted as they would be understood from the perspective of a reasonable person in the position of the insured.

*Id.* (further citations omitted).

The insurance policy in question contains a broad pollution exclusion[2] which excludes coverage for any claim or any obligation to defend a suit or claim against the insured "arising out of the contamination or alleged contamination of any environment by POLLUTANTS." The policy defines the terms of the exclusion as follows:

> POLLUTANTS - means any solid, liquid, gaseous, or thermal irritant or contaminant, including

---

[2] The pollution exclusion in the policy is broad, containing language which excludes coverage "whether or not the contamination is introduced into the environment intentionally or accidentally or gradually or suddenly and whether or not the INSURED and/or any other person or organization is responsible for the contamination." The policy also states that coverage is excluded "whether such results from the INSURED's and/or any other person's or organization's activities, whether or not such is sudden, gradual, intended, foreseeable, expected, fortuitous, inevitable and wherever or however such occurs." *See Just v. Land Reclamation, Ltd.*, 155 Wis. 2d 737, 456 N.W.2d 570, *modified*, 157 Wis. 2d 507 (1990) (holding that the terms "sudden and accidental" in a pollution exclusion clause means unexpected and unintended, thus excluding coverage even if pollution occurs over a period of time).

smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed. The term POLLUTANTS, as used herein, is not defined to mean potable water, agricultural water, water furnished to commercial users or water used for fire suppression.

. . . .

Contamination includes any unclean, unsafe, damaging, injurious or unhealthful condition, either actual or potential, which arises out of the presence in the environment of any POLLUTANT, whether permanent or transient.

Environment includes any person, any man-made object or feature, animals, crops and vegetables, land, bodies of water, underground water, or water table or aquifer, air and any other natural feature of the earth and its atmosphere, whether or not altered, developed or cultivated.

Further, the policy states:

It is the intent and effect of this exclusion to exclude any and/or all coverages afforded by this policy for any CLAIM, action, judgment, liability, settlement, defense or expenses, if any, arising out of the discharge, dispersal, release or escape of POLLUTANTS.

The parties do not dispute that the Guenthers' basement is an "environment" or that the sewage "discharg[ed], dispers[ed], releas[ed] or escap[ed]" into the basement when it came through the drain in the basement floor. However, they do dispute whether the sewage which came into the basement caused damage due to "contamination . . . by pollutants."

The definitions of "contamination" and "pollutants" are related and must be interpreted together. The appellants argue that the sewage was not a pollu-

212

tant, even though the definition of pollutant contained in the policy includes waste, because the human waste in the sewage was combined with a lot of water. The appellants also point out that the policy's definition of pollutants does not include "potable water, agricultural water, water furnished to commercial users or water used for fire suppression." Although those terms describe different types of water quality used in different situations, *i.e.*, domestic, agricultural, industrial, and emergency, none of the terms describes sewer water, *i.e.*, water which is currently not suited for any type of use. The combination of fecal matter, mud and sludge suspended in the water that flooded the Guenthers' basement could be considered a pollutant under the policy definition. However, even if it were, our inquiry does not end because the pollution exclusion does not apply unless the sewage caused damage by "contaminating" the basement.

The policy's definition of "contamination" implies that in order for contamination to occur, the harm must be caused by the toxic nature of the discharged material. *Beahm v. Pautsch*, 180 Wis. 2d 574, 584, 510 N.W.2d 702, 706 (Ct. App. 1993). According to Ron Guenther's sworn statement, some of the damage to the Guenthers' property was due to properties of sewage unrelated to any potentially toxic qualities it may have had.[3]

In *Beahm*, we interpreted a pollution exclusion[4] similar to the one at issue here. In that case, smoke

---

[3] Q   ... Do you have an opinion whether or not, if this had been clean water, whether you would have still suffered some damages?

A   Oh, we would have certainly.

[4] The policy in *Beahm* did not apply to damages which resulted directly or indirectly from:

from fires set by the insured to burn off winter grass obscured the vision of motorists on a nearby highway causing an accident. The insurer refused coverage for the accident based on the pollution exclusion contained in its policy. *Id.* at 579, 510 N.W.2d at 704. We concluded that a reasonable insured would understand that the pollution exclusion clause excluded coverage only where the damage was caused by the toxic nature of the smoke which the insured allowed to escape into the environment. *Id.* at 584–85, 510 N.W.2d at 706–07. However, because the harm resulted from the inherent opacity of smoke, and not from any of smoke's toxic properties, such as its ability to corrode property or to injure a person's eyes, skin or respiratory system, we concluded that the damage which occurred was not contamination by a pollutant; and therefore, it was covered under the insurance policy. *Id.*

The distinction between the toxic and non-toxic qualities of a discharge or release may be better understood with an example. Suppose a high school swimming pool cracks and floods a vacant classroom with water which includes chlorine, a toxic substance. The damage to the desks, papers and books in the room would likely result from the liquid nature of the water, irrespective of whether it contained chlorine. However, if the pool flooded into a large aquarium filled with exotic salt water fish and all the fish died from expo-

the discharge, dispersal, release or escape of smoke, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon the land, the atmosphere or a water course, body of water, bog, marsh, swamp or wetland.

*Beahm v. Pautsch*, 180 Wis. 2d 574, 580, 510 N.W.2d 702, 705 (Ct. App. 1993).

sure to chlorine, then the damage would be the result of the toxic nature of the chlorinated water.

Similar to the situation in *Beahm* and to the example above, at least some of the damage to the Guenthers' property was not caused by the toxic nature of the sewage. The Guenthers submitted sworn statements that imply that the inventory, office supplies, business documents, and equipment in their basement were damaged by the liquid nature of the sewage. Ron Guenther's sworn statements contended that the sewage made the basement smell bad; therefore, the basement was also damaged by the odor of the sewage. No evidence was submitted which showed damage tied to any toxic properties which the sewage may have had. Because we conclude that the pollution exclusion does not apply to damage resulting from the liquid, non-toxic nature of the domestic sewage that was discharged into the Guenthers' basement, we conclude there is coverage under the policy for at least some of the Guenthers' damages.

The objective that initially promoted the inclusion in insurance contracts of exclusions for contamination by pollution supports our interpretation of the insurance policy at issue here. For example, the Insurance Rating Board and the Mutual Insurance Rating Bureau drafted the general pollution exclusion clauses for the insurance industry, in an effort to limit the catastrophic damages that resulted from environmental accidents, such as oil spills. Nothing in the history of environmental pollution exclusions shows that they were intended to exclude more ordinary events, such as sewer backups. *See id.* at 582–84, 510 N.W.2d at 705–06 (further citations omitted). Therefore, pollution exclusion clauses may not always apply where the injury results from fundamental or everyday activities.

215

*Donaldson*, 211 Wis. 2d at 232, 564 N.W.2d at 732; *Peace v. Northwestern Nat'l Ins. Co.*, 215 Wis. 2d 164, 173, 573 N.W.2d 197, 200 (Ct. App. 1997).

For example, in *Donaldson*, the supreme court concluded that an insurance contract covered injuries caused by excess carbon dioxide in a building because the policy's pollution exclusion clause did not plainly and clearly alert the insured that coverage would be denied for injuries resulting from an activity as fundamental as human respiration. *Donaldson*, 211 Wis. 2d at 231–32, 564 N.W.2d at 732. Similarly, in *Peace,* we concluded an insurance policy covered injuries sustained by a child who ingested lead from paint chips. Lead derived from paint chips was held not to be a pollutant under the pollution exclusion in question because lead is often added to paint and painted surfaces routinely chip and peel. Therefore, the child suffered injury from an activity "gone slightly, but not surprisingly, awry." *Peace*, 215 Wis. 2d at 173, 573 N.W.2d at 200 (quoting *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1044 (7th Cir. 1992)).

▬ Just as paint may chip off walls, sewers may backup into basements. Therefore, based on the reasoning in *Peace,* the discharge of sewage into the Guenthers' basement is not necessarily contamination by a pollutant because the damage was the result of an activity "gone slightly, but not surprisingly, awry." *Id.* A sewer backup is precisely the type of routine occurrence which causes damage for which Onalaska would have reasonably expected insurance coverage when it purchased the Mutual Insurance policy. Accordingly, we conclude coverage for at least some of the damages resulting from the sewer's backup into the Guenthers'

216

basement is available through the insurance Onalaska purchased from Mutual Insurance.[5]

## CONCLUSION

Onalaska could reasonably have understood that the pollution exclusion contained in its insurance policy with Mutual Insurance did not apply to a situation as routine as a domestic sewer backup, which caused damages that did not result from the toxic nature of the

---

[5] We do not hold that sewage can never be a pollutant which contaminates an environment. We merely conclude that there may be unresolved factual issues regarding the characterization of domestic sewage sludge, as there are here. Several courts in other jurisdictions have recognized a distinction between toxic industrial sewage and non-toxic, non-hazardous domestic sewage. *See Incorporated Village of Cedarhurst v. Hanover Ins. Co.*, 675 N.E.2d 822 (N.Y. 1996) (municipal sewage which flooded basements, not pollutant); *United States Fidelity & Guar. Co. v. Armstrong*, 479 So. 2d 1164 (Ala. 1985) (pollution exclusion refers to industrial pollution, not natural city sewage); *Minerva Enters., Inc. v. Bituminous Cas. Corp.*, 851 S.W.2d 403 (Ark. 1993) (definition of "pollutants" intended to exclude industrial wastes, not common household wastes). Thus, even though the insurance policy lists "wastes" and "fumes" in its definition of "pollutants," Mutual Insurance, by showing that the basement smelled bad, did not meet its burden of showing that the toxic properties of the waste and fumes caused the damage. *See City of Bremerton v. Harbor Ins. Co.*, 963 P.2d 194 (Wash. Ct. App. 1998) ("noxious and toxic fumes" and "foul and toxic odors and gases" are "pollutants" within the meaning of pollution exclusion); *City of Englewood v. Commercial Union Assurance*, 940 P.2d 948 (Colo. Ct. App. 1996) (unresolved legal and factual question about nature of recycled sewage precluded insurers' reliance on pollution exclusion to avoid duty to defend).

sewage. Therefore, we conclude the policy is ambiguous, and we construe it in favor of coverage.

*By the Court.*—Judgment reversed and cause remanded.