# Supreme Court of Wisconsin

| | |
|---|---|
| CASE NO.: | 2013AP1303 |
| COMPLETE TITLE: | Acuity, A Mutual Insurance Company, Third-Party Plaintiff-Respondent-Petitioner, v. Chartis Specialty Insurance Company, sued as and f/k/a American International Specialty Lines Insurance Company, Third-Party Defendant-Appellant. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 353 Wis. 2d 554, 846 N.W.2d 34
(Ct. App. 2014 – Unpublished)

| | |
|---|---|
| OPINION FILED: | March 17, 2015 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | January 14, 2015 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Waukesha |
| JUDGE: | J. Mac Davis |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the third-party plaintiff-respondent-petitioner, there were briefs by *Michael J. Cohen*, *Joseph J. Sarmiento*, and *Meissner Tierney Fisher & Nichols, S.C.*, Milwaukee, and *Lance S. Grady*, *Daniel K. Miller*, and *Grady Hayes & Neary, LLC*, Waukesha. Oral argument by *Michael J. Cohen*.

For the third-party defendant-appellant, there was a brief by *Mark W. Rattan*, *Ericka C. Piotrowski*, and *Litchfield Cavo LLP*, Brookfield. Oral argument by *Mark W. Rattan*.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2013AP1303
(L.C. No. 2009CV2478, 2009CV4611, 2010CV1506 & 2011CV2087)

STATE OF WISCONSIN        :        IN SUPREME COURT

Acuity, A Mutual Insurance Company,

        Third-Party Plaintiff-Respondent-
        Petitioner

        v.

Chartis Specialty Insurance Company, sued as
and f/k/a American International Specialty
Lines Insurance Company

        Third-Party Defendant-Appellant

**FILED**

**MAR 17, 2015**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Reversed.*

¶1   SHIRLEY S. ABRAHAMSON, C.J.   This is a review of an unpublished decision of the court of appeals reversing orders and a judgment of the Circuit Court for Waukesha County, J. Mac Davis, Judge.[1]

¶2   The dispute in the instant case is between two insurance companies: Acuity, A Mutual Insurance Company and

---

[1] *Acuity, A Mutual Ins. Co. v. Chartis Specialty Ins. Co.*, No. 2013AP1303, unpublished slip op. (Wis. Ct. App. Mar. 12, 2014).

Chartis Specialty Insurance Company.[2] Both insurance companies issued liability policies to Dorner, Inc., a construction company, the insured.[3] The Acuity policy was a Comprehensive General Liability (CGL) policy. The Chartis policy was a Contractors' Pollution Liability (CPL) policy.

¶3 Acuity has defended and indemnified the insured in four lawsuits seeking recovery for bodily injury and property damage caused by a natural gas-fueled explosion and fire. This explosion and fire occurred after the insured's employees disturbed an underground natural gas pipeline during an excavation project. Acuity now seeks recovery from Chartis, asserting that Chartis's CPL policy provides coverage for the insured in these four lawsuits.

¶4 The dispute in the instant case revolves around the insurance companies' different interpretations of Chartis's duties and obligations to the insured under Chartis's CPL policy.

¶5 The circuit court concluded that Chartis breached its duties of defense and indemnification under the CPL policy and ordered Chartis to share with Acuity "on a 50-50 basis" the cost

---

[2] Chartis was formerly known as American International Specialty Lines Insurance Company (AISLIC) and was sued under that name.

[3] Dorner, Inc. is not a party in this review because Acuity has paid all of the insured's defense costs and indemnity settlements and the lawsuits against the insured have been settled and dismissed.

of defending and indemnifying the insured. Pursuant to this order, a money judgment was entered in favor of Acuity and against Chartis for $785,880.90 (which constitutes one-half of the indemnity settlement payments of $1,531,761.80 that Acuity paid on the insured's behalf), plus taxable costs of $905.75. The two insurance companies stipulated that Chartis had already paid one-half of the total defense fees.

¶6 The court of appeals reversed the judgment and orders of the circuit court and ruled in favor of Chartis. The court of appeals held that the claims of bodily injury and property damage asserted against the insured were not "caused by Pollution Conditions" and therefore were not covered under Chartis's CPL policy.

¶7 Chartis, according to the court of appeals, had no duty to defend the insured in the four lawsuits. The court of appeals remanded the matter to the circuit court with directions to enter judgment in favor of Chartis and against Acuity for the sum Chartis had paid Acuity toward the insured's defense fees.

¶8 For the reasons set forth, we agree with the circuit court's determination that that the natural gas leak was a pollution condition under Chartis's CPL policy and that this pollution condition caused the bodily injury and property damage alleged in the four lawsuits. We therefore conclude that Chartis's CPL policy covers the insured's liability arising from the natural gas-fueled explosion and fire. Chartis must pay its share of the defense fees and indemnity payments as ordered by the circuit court. Accordingly, we reverse the decision of the

3

court of appeals and remand the cause to the circuit court to reinstate the judgment in favor of Acuity and against Chartis.

I

¶9 The facts are not in dispute for purposes of this review.

¶10 The insured contracted with the Wisconsin Department of Transportation to perform road construction, including underground excavation. While the insured's employees were excavating a portion of Worthington Street in Oconomowoc, Wisconsin, they discovered a pressurized natural gas pipe and incorrectly concluded that it was no longer in use. The employees attempted to move the pipe, damaging it in the process.

¶11 The damage to the pipe caused natural gas to escape. Shortly thereafter, natural gas that had leaked out of the damaged pipe exploded, causing a fire. The explosion and fire caused property damage to various buildings, including a nearby church and residence, and caused personal injury to various people at the scene.

¶12 In the aftermath of the explosion and fire, four lawsuits were filed against the insured seeking recovery for property damage and bodily injury. These four lawsuits were consolidated in Waukesha County Circuit Court.

¶13 Acuity undertook the insured's defense in the four lawsuits. The insured and Acuity filed a third-party complaint against Chartis seeking, among other things, a declaration that

Chartis has a duty to defend and indemnify the insured in the four lawsuits.

¶14 Acuity did not contest its duties to defend and indemnify the insured and does not contest its liability in the instant case. Rather, it seeks reimbursement from Chartis for one-half of the defense fees incurred in representing the insured and one-half of the indemnity payments made on the insured's behalf.

¶15 Chartis denies coverage under its CPL policy, which covers the insured's liability for "Bodily Injury [or] Property Damage . . . caused by Pollution Conditions . . . ." Chartis does not contest that the four lawsuits allege bodily injury and property damage resulting from the natural gas-fueled explosion and fire. Rather, Chartis asserts that neither the natural gas-fueled explosion and fire nor the resulting bodily injury and property damage were "caused by Pollution Conditions" as required by the CPL policy.

¶16 Acuity and Chartis filed opposing motions for summary judgment on the issue of coverage under Chartis's CPL policy. On January 28, 2011, the circuit court entered summary judgment in favor of Acuity. The circuit court determined that the natural gas that leaked from the damaged pipe constitutes a "contaminant" under the CPL policy and thus that its release from the damaged pipe was a "pollution condition" under the policy. The circuit court explained: "[N]atural gas doesn't belong floating around in the street, or in the church, or in

the air around this area because it might blow up.  So it's a contaminant in that sense, it's certainly dangerous."

¶17 With regard to the allocation of defense fees and indemnity payments, the circuit court entered an order on May 25, 2012, instructing Acuity and Chartis to split the cost of defending and indemnifying the insured "on a 50-50 basis."

¶18 The underlying lawsuits settled, and Chartis paid its one-half share of the defense fees incurred by Acuity.  The circuit court entered an order on May 2, 2013, after the four lawsuits had settled, instructing Chartis to pay its one-half share of the indemnity settlement payments as well.  On May 8, 2013, a money judgment was entered against Chartis.

¶19 The court of appeals reversed the circuit court and remanded the cause to the circuit court with instructions to vacate the orders and judgment in favor of Acuity and to enter judgment in favor of Chartis.  The court of appeals provided scant explanation of its decision, concluding that the four lawsuits alleged bodily injury and property damage "due only to the explosion and fire, not to contact with the escaped natural gas itself because the gas intrinsically is an 'irritant or contaminant' . . . ."[4]  Thus, the opinion continues, coverage under Chartis's CPL policy is not "fairly debatable" and Chartis had no duty to defend the insured in the underlying lawsuits.[5]

---

[4] Acuity, A Mutual Ins. Co. v. Chartis Specialty Ins. Co., No. 2013AP1303, unpublished slip op., ¶14 (Wis. Ct. App. Mar. 12, 2014).

[5] Id.

II

¶20  We review the circuit court's grant of summary judgment in favor of Acuity using the same standards and methods applied by the circuit court.[6]  Under Wis. Stat. § 802.08(2) (2011-12),[7] a moving party is entitled to summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[8]  The parties in the instant case do not dispute the facts.  The issue is whether Acuity is entitled to judgment as a matter of law.

¶21  Whether Acuity is entitled to summary judgment as a matter of law depends on the interpretation of Chartis's CPL policy.  The interpretation of an insurance policy ordinarily presents a question of law that this court decides independently of the circuit court and court of appeals, but benefiting from their analyses.[9]

III

¶22  We begin by repeating the rules governing a court's interpretation of an insurance policy.  These rules have been set forth many times.

---

[6] Pawlowski v. Am. Family Mut. Ins. Co., 2009 WI 105, ¶15, 322 Wis. 2d 21, 777 N.W.2d 67.

[7] All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated.

[8] Pawlowski, 322 Wis. 2d 21, ¶15.

[9] Martin v. Am. Family Mut. Ins. Co., 2002 WI 40, ¶10, 252 Wis. 2d 103, 643 N.W.2d 452.

¶23 Words and phrases in insurance policies are subject to the same rules of construction applicable to contracts generally.[10] The primary objective in construing these words and phrases is "to ascertain and carry out the true intent of the parties."[11] To that end, "a court may consider the purpose or subject matter of the insurance, the situation of the parties, and the circumstances surrounding the making of the contract."[12]

¶24 When language in an insurance policy is unambiguous, a court will not rewrite the policy by interpretation or impose obligations the parties did not undertake.[13] However, when language in an insurance policy is ambiguous, it should be construed against the insurance company that drafted the policy.[14] "Under the doctrine of contra proferentem, ambiguities in a policy's terms are to be resolved in favor of coverage, while coverage exclusion clauses are construed narrowly against the insurer."[15]

¶25 To protect the insured's reasonable expectations of coverage, a policy's terms "should be interpreted as they would

---

[10] Frost ex rel. Anderson v. Whitbeck, 2002 WI 129, ¶15, 257 Wis. 2d 80, 654 N.W.2d 225.

[11] Id., ¶16.

[12] Id., ¶22.

[13] Id., ¶17.

[14] Id., ¶19.

[15] Donaldson v. Urban Land Interests, Inc., 211 Wis. 2d 224, 230, 564 N.W.2d 728 (1997) (footnote omitted).

be understood from the perspective of a reasonable person in the position of the insured."[16]

¶26 To determine whether a duty to defend exists, the court must compare "the allegations of the complaint to the terms of the insurance policy."[17] As this court declared in Liebovich v. Minnesota Insurance Co., 2008 WI 75, ¶16, 310 Wis. 2d 751, 751 N.W.2d 764, "[a]n insurer has a duty to defend when there are allegations in a complaint that, if proven, would give rise to recovery under the terms and conditions of the insurance policy." (Internal quotation marks omitted.)

---

[16] Id.

Two more recent cases discuss the reasonable insured standard for interpreting a general liability policy's pollution exclusion clause. See Preisler v. Gen. Cas. Ins. Co., 2014 WI 135, ¶40, ___ Wis. 2d ___, 857 N.W.2d 136; Wilson Mutual Ins. Co. v. Falk, 2014 WI 136, ¶38, ___ Wis. 2d ___, 857 N.W.2d 156.

[17] Fireman's Fund Ins. Co. of Wis. v. Bradley Corp., 2003 WI 33, ¶19, 261 Wis. 2d 4, 660 N.W.2d 666. See also Estate of Sustache v. Am. Family Mut. Ins. Co., 2008 WI 87, ¶20, 311 Wis. 2d 548, 751 N.W.2d 845 (stating that the "allegations contained within the four corners of the complaint" trigger the duty to defend).

The insurance policy at issue in the instant case provides a duty to defend as follows:

**B. DEFENSE**

> When a **Claim** is made against the **Insured** to which Section I. **INSURING AGREEMENT, A. COVERAGE** above applies, the Company has the right to appoint counsel and the duty to defend such **Claim**, even if groundless, false, or fraudulent.

¶27 Although "the duty to defend is triggered by arguable, as opposed to actual, coverage,"[18] the duty to indemnify is triggered by actual coverage.[19] In other words, the duty to defend depends upon the nature, not the merits, of the claim against the insured,[20] while the duty to indemnify depends on the merits of the claim.[21] The duty to defend is therefore broader than the duty to indemnify.[22]

¶28 Employing these rules of interpretation, a court engages in a three-step process to determine whether an insurance policy provides coverage.[23] A court first determines

---

[18] Fireman's Fund, 261 Wis. 2d 4, ¶20 (emphasis added).

[19] See 14 Steven Plitt et al., Couch on Insurance § 200:3 at 200-10 (3rd ed. 1997) (explaining that the duty to defend depends on whether there is a possibility of "liability to indemnify," whereas "the duty to indemnify [] arises only when the insured's underlying liability is established" (emphasis added)).

[20] Liebovich v. Minn. Ins. Co., 2008 WI 75, ¶16, 310 Wis. 2d 751, 751 N.W.2d 764.

[21] See 14 Plitt et al., supra note 19, § 200:3 at 200-10 ("[T]he duty to indemnify arises only once liability has been conclusively determined."). See also 2 Arnold P. Anderson, Wisconsin Insurance Law § 7.24 (6th ed. 2010) (stating that the duty to defend "depends on the nature of the claim and has nothing to do with the merits of the claim" and explaining that "[t]he duty to indemnify is not reached if there is no arguable coverage (duty to defend)").

[22] Elliott v. Donahue, 169 Wis. 2d 310, 320, 485 N.W.2d 403 (1992).

[23] See, e.g., Preisler, ___ Wis. 2d ___, ¶22; Wilson Mut., ___ Wis. 2d ___, ¶26; Wadzinski v. Auto-Owners Ins. Co., 2012 WI 75, ¶14, 342 Wis. 2d 311, 818 N.W.2d 819.

whether the dispute at issue falls within the initial coverage grant of the policy. If so, the court then determines whether any of the policy's exclusions apply to remove the matter from the scope of the policy's coverage. If an exclusion applies, the court must then decide whether an exception to the exclusion applies to reinstate coverage.

¶29 With these interpretive principles in mind, we turn to Chartis's CPL policy, the policy at issue.

IV

¶30 Three sections of Chartis's CPL policy are important to determining Chartis's liability in the present case.

¶31 First is the coverage section of the CPL policy. The policy provides that Chartis will cover the insured's liability for claims of bodily injury and property damage "caused by Pollution Conditions." The relevant coverage provision states as follows:

**A. COVERAGE**

1. The **Company** will pay on behalf of the **Insured** all sums that the **Insured** shall become legally obligated to pay as **Loss** as a result of **Claims** for **Bodily Injury, Property Damage**, or **Environmental Damage** caused by **Pollution Conditions** resulting from **Covered Operations**. The **Pollution Conditions** must be unexpected and unintended from the standpoint of the **Insured.** The **Bodily Injury, Property Damage**, or **Environmental Damage** must occur during the **Policy Period.**

¶32 Second is the CPL policy's definitions of the phrases "Pollution Conditions" and "Covered Operations," which are critical to defining the scope of the policy's coverage.

11

¶33 The phrase "Pollution Conditions" is defined by the policy as the "release or escape of any solid, liquid, gaseous, or thermal irritant or contaminant . . . into or upon land, or any structure on land, [or] the atmosphere . . . provided such conditions are not naturally present in the environment in the concentration or amounts discovered." The policy does not define the terms "irritant" or "contaminant." The full definition of "Pollution Conditions" is as follows:

> **Pollution Conditions** means the discharge, dispersal, release or escape of any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, medical waste and waste materials into or upon land, or any structure on land, the atmosphere or any watercourse or body of water, including groundwater, provided such conditions are not naturally present in the environment in the concentration or amounts discovered.

¶34 The phrase "Covered Operations" is defined by Chartis's CPL policy as "those activities performed by the Named Insured at a job site." No one disputes that the insured's excavation project, during which the insured's employees damaged the natural gas pipe, was a covered operation under the policy.

¶35 Third are the policy's "other insurance" provisions. An endorsement to the CPL policy regarding other insurance provides that "[w]here other insurance may be available for Loss covered under [the CPL] Policy," the CPL policy "is primary." The endorsement details Chartis's obligations under such circumstances, including its obligation to contribute one half of the cost of covering an insured's liability when the

12

insured's other insurance policy "is also primary" and that policy "permits contribution by equal shares."

¶36 The "other insurance" endorsement to the CPL policy also excludes from coverage any claim arising out of covered operations with respect to which the named insured is insured under another CPL policy.

¶37 We now explore these sections of the CPL policy in the context of the facts underlying the instant case. We begin by determining whether the escape of natural gas from the damaged pipe falls within the policy's definition of "Pollution Conditions." More specifically, we address whether the four lawsuits assert claims of bodily injury or property damage "caused by Pollution Conditions." We explore the "other insurance" sections of the CPL policy last.

V

¶38 We address three arguments the parties pose regarding Chartis's obligations under its CPL policy to defend and indemnify the insured.

¶39 First, the parties dispute whether the escape of natural gas from the damaged pipe constitutes a pollution condition. This dispute centers on whether natural gas is an "irritant or contaminant."

¶40 Second, if the escape of natural gas from the damaged pipe was a pollution condition, the parties dispute whether the property damage and bodily injury alleged in the four lawsuits were "caused" by that pollution condition.

13

¶41  Third, the parties dispute whether concurrent coverage under Acuity's CGL policy and Chartis's CPL policy is possible in the instant case.

1

¶42  First, we address whether the escape of natural gas from the damaged pipe constitutes a pollution condition.  The answer turns on whether the natural gas that escaped from the damaged pipe was an "irritant or contaminant."  Chartis's policy does not define the words  "irritant" and "contaminant."  The court has, however, previously interpreted the words "irritant" and "contaminant" in the context of pollution exclusion clauses in general liability policies.

¶43  In the instant case, we are interpreting the words "irritant" and "contaminant" in the CPL policy's statement of coverage.  The meanings of these words when used in a CPL policy's statement of coverage may be different than the meanings of these words when used in a pollution exclusion clause in a general liability policy.  As explained previously, ambiguities in the coverage terms of an insurance policy are construed broadly (in favor of coverage), while ambiguities in an insurance policy's exclusion are construed narrowly (in favor of coverage).[24]  Nevertheless, our interpretation of the words "irritant" and "contaminant" in prior cases involving pollution exclusion clauses is instructive.

---

[24] Donaldson, 211 Wis. 2d at 230.

¶44 When interpreting these words in the context of pollution exclusion clauses in general liability policies, the court has used the common, ordinary, dictionary definitions of these words.

¶45 Furthermore, in the pollution exclusion clause cases, the court has interpreted the words "irritant" and "contaminant" by looking to the particular fact situation presented. The court has recognized that the words "irritant" and "contaminant," when "viewed in isolation, are virtually boundless, for there is virtually no substance or chemical in existence that would not irritate or damage some person or property."[25] Thus, when interpreting these words in a pollution exclusion clause, the court has applied limiting principles to prevent the exclusion from extending beyond its intended scope and leading to absurd results.[26]

¶46 In discussing whether natural gas is a contaminant, the parties in the instant case focus on two pollution exclusion clause cases: Peace ex rel. Lerner v. Northwestern National Insurance Co., 228 Wis. 2d 106, 596 N.W.2d 429 (1999), and Hirschhorn v. Auto-Owners Insurance Co., 2012 WI 20, 338 Wis. 2d 761, 809 N.W.2d 529.

---

[25] Id. at 232 (quoting Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co., 976 F.2d 1037, 1043 (7th Cir. 1992)).

[26] Donaldson, 211 Wis. 2d at 232 (citing Pipefitters, 976 F.2d at 1043).

¶47 In Peace, the issues were whether lead paint was a pollutant and, relatedly, whether damage caused by lead paint was excluded from coverage under an insurance policy's pollution exclusion clause.

¶48 The insured landlords in Peace sought coverage under their commercial general liability policy for a child tenant's personal injury claim. The complaint alleged that the landlord "negligently failed to properly remove all lead-based paint from the property"; that the child had ingested lead paint chips, flakes, and dust inside the property; and that the child suffered lead poisoning as a result.[27]

¶49 The landlords' commercial general liability policy excluded from coverage all claims of bodily injury or property damage "arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants . . . ."[28] The policy defined "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant . . . ."[29] The insurance company asserted that lead paint was a contaminant and thus a pollutant, and denied coverage under the policy's pollution exclusion clause.

¶50 The Peace court observed that the commercial general liability policy provided no definition of "contaminant." The

---

[27] Peace ex rel. Lerner v. Nw. Nat'l Ins. Co., 228 Wis. 2d 106, 113-14, 596 N.W.2d 429 (1999).

[28] Id. at 113.

[29] Id.

court stated: "When determining the ordinary meaning of [undefined] words, it is appropriate to look to the definitions in a non-legal dictionary."[30] The court further stated that the dictionary definition of "contaminant" is "one that contaminates."[31] "Contaminate," the court explained, "is defined as '1. To make impure or unclean by contact or mixture.'"[32]

¶51 Because of the severe consequences of lead poisoning for human health, the Peace court concluded that "[t]here is little doubt that lead derived from lead paint chips, flakes, or dust is . . . [a] serious contaminant."[33] Thus, the Peace court determined that lead released from "lead paint, chips, flakes, or dust" fell under the definition of "pollutant" in the pollution exclusion clause of the commercial general liability policy at issue. The Peace court barred recovery on that ground.

¶52 A second case defining "pollutant," this time for purposes of a pollution exclusion clause in a homeowner's policy, is Hirschhorn v. Auto-Owners Insurance Co., 2012 WI 20, 338 Wis. 2d 761, 809 N.W.2d 529.

¶53 In Hirschhorn, insured homeowners sought coverage under their homeowners' policy for damage to their vacation home

---

[30] Id. at 122.

[31] Id.

[32] Id.

[33] Id. at 125.

that resulted from "the accumulation of bat guano between the home's siding and walls."[34] The alleged damage was a "penetrating and offensive odor emanating from the home."[35]

¶54 The homeowners' policy at issue in Hirschhorn contained a pollution exclusion clause similar to the one at issue in Peace. This pollution exclusion clause barred recovery for any "loss resulting directly or indirectly from . . . [the] discharge, release, escape, seepage, migration or dispersal of pollutants."[36] The policy defined "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including . . . waste."[37]

¶55 As in Peace, the policy in Hirschhorn included no definition of "contaminant." The Hirschhorn court applied the dictionary definition of "contaminant" provided by the Peace court, concluding that bat guano──like the lead released from lead paint──is a contaminant and thus a pollutant. The court explained that "bat guano and its attendant odor make impure or unclean the surrounding ground and air space . . . ."[38] Thus,

---

[34] Hirschhorn v. Auto-Owners Ins. Co., 2012 WI 20, ¶8, 338 Wis. 2d 761, 809 N.W.2d 529.

[35] Id.

[36] Id., ¶5.

[37] Id.

[38] Id., ¶33 (internal quotation marks omitted).

the court barred recovery under the policy's pollution exclusion clause.[39]

¶56 Using the dictionary definition of "contaminant" applied by the court in Peace and Hirschhorn, natural gas that is released into the air from a damaged natural gas pipe constitutes a contaminant. Natural gas renders the surrounding ground and air space impure or unclean because natural gas is extremely flammable and explosive.[40] An explosion and fire resulted in "great harm" in the present case. Thus, we conclude that natural gas is a contaminant under the circumstances of the present case.

¶57 However, to qualify as a pollution condition under Chartis's CPL policy, the contaminant must also be released in concentrations above those "naturally present in the environment." In the instant case, the natural gas released at the site of the explosion and fire indisputably occurred in

---

[39] For additional discussion of Peace, Hirschhorn, and related cases that interpret the words "irritant" and "contaminant" in pollution exclusion clauses, see Preisler, ___ Wis. 2d ___, ¶¶29-52, and Wilson Mutual, ___ Wis. 2d ___, ¶¶23-52.

[40] Natural gas invariably contains methane, usually contains ethane, and sometimes contains propane and butane, all of which are combustible. G.G. Nasr & N.E. Connor, Natural Gas Engineering Safety and Challenges: Downstream Process, Analysis, Utilization and Safety 2 (2014). Consequently, the release of natural gas may result in fires or explosion. See U.S. Dep't of Transportation, The State of National Pipeline Infrastructure 2, https://opsweb.phmsa.dot.gov/pipelineforum/docs/Long%20Version%2 0Preliminary%20Report%20on%20Infrastructure%20040711draftwDecade CauseCharts.pdf (last visited March 12, 2015).

concentrations above those "naturally found in the environment." The escape of natural gas from the damaged pipe was, therefore, a pollution condition under Chartis's CPL policy.

¶58 Furthermore, the expectations of a reasonable insured guide our analysis. A reasonable insured in the position of the insured construction company in the instant case would believe that natural gas inadvertently released into the air is a contaminant that creates a pollution condition.

¶59 The insured construction company in the instant case contracts with the Wisconsin Department of Transportation to perform road construction, including excavation. The insured knows that numerous sources of contamination are found underground, including natural gas pipelines, sanitary sewer lines, and septic tanks. The insured operates heavy machinery excavating near and around these various contamination sources.

¶60 Any reasonable insured construction company engaged in this kind of work would be concerned about possibly damaging these contamination sources and releasing contaminants. Consequently, a reasonable insured construction company would expect its CPL policy to cover damages from the accidental release of contaminants during an excavation. In other words, a reasonable insured construction company would conclude that the natural gas leak in the instant case constituted a pollution condition under Chartis's CPL policy.

¶61 To summarize: "Pollution Conditions" is defined by Chartis's CPL policy as the "release or escape of any . . . gaseous . . . irritant or contaminant . . . [into] the

atmosphere . . . provided such conditions are not naturally present in the environment in the concentration or amounts discovered." Natural gas is, of course, "gaseous." Natural gas is also a "contaminant" under the circumstances of the instant case. Natural gas was "release[d] or escape[d]" from the damaged natural gas pipe, and there is no dispute that natural gas is "not naturally present in the environment in the concentration" that caused the explosion and fire.

¶62 We therefore agree with Acuity and the circuit court that natural gas constitutes a "contaminant" in the instant case and that the escape of natural gas from the damaged pipe was a pollution condition under Chartis's CPL policy.

2

¶63 Having determined that natural gas constitutes a contaminant and that the escape of natural gas from the damaged pipe was a pollution condition under Chartis's CPL policy, we next address whether this pollution condition caused the property damage and bodily injury alleged in the four lawsuits brought against the insured.

¶64 The coverage provision in Chartis's CPL policy states that Chartis will pay on behalf of the insured all sums that the insured shall become legally obligated to pay for bodily injury or property damage "caused by Pollution Conditions." (Emphasis added.)

¶65 We conclude that the bodily injury and property damage alleged in the four lawsuits fulfill this requirement, that is,

21

the alleged bodily injury and property damage were "caused by Pollution Conditions."

¶66 Our reasoning is simple. Each of the four lawsuits against the insured alleges that the actions of the insured's employees led to a natural gas leak that ultimately resulted in an explosion and fire, causing bodily injury and property damage. There is no dispute that the natural gas leak caused the explosion and fire. There is no dispute that the explosion and fire caused the alleged bodily injury and property damage. This sequence of events is sufficient to establish that the escape of natural gas (a pollution condition) caused the alleged bodily injury and property damage.

¶67 In Peace, the release of lead from lead paint, chips, and dust caused the child tenant to ingest lead, and the ingestion of lead poisoned the child. In Hirschhorn, the release of bat guano into the walls led to an offensive odor, and the offensive odor made the property uninhabitable. As in Peace and Hirschhorn, it is clear under the language of Chartis's CPL policy that the bodily injury and property damage alleged in the four lawsuits were "caused by Pollution Conditions."

¶68 Chartis, however, contends that the language of the CPL policy does not mean what it says. Chartis argues that to fulfill the policy's causation requirement, it is not enough that a substance capable of acting as a contaminant was the but-for cause of the alleged bodily injury and property damage. Rather, according to Chartis, "the contaminating nature of the

22

substance at issue" must directly cause the alleged bodily injury and property damage.  (Emphasis added.)

¶69  Chartis contends that the bodily injury and property damage alleged in the four lawsuits were caused by the explosion and fire, not by the contaminating nature of natural gas.  Thus, Chartis reasons, there is no coverage under the CPL policy.

¶70  We are not convinced by Chartis's argument.

¶71  First, Chartis fails to tether its argument to the language of the CPL policy.  We do not agree that Chartis's CPL policy requires the contaminating nature of the substance at issue to cause the alleged damage in order to trigger coverage.  On its face, the CPL policy covers claims of bodily injury or property damage "caused by Pollution Conditions"——nothing more, nothing less.  Chartis does not explain why this court should read a more stringent causation requirement into this provision.

¶72  Second, even assuming that the contaminating nature of the contaminant must cause the bodily injury or property damage, we conclude that the contaminating nature of natural gas is precisely what caused the bodily injury and property damage alleged in the four lawsuits.

23

¶73 As discussed previously, natural gas is a contaminant. It can cause injury through inhalation[41] and when it mixes with air in certain concentrations, it can explode or ignite. In other words, part of the contaminating nature of natural gas is its capacity to cause explosions and fire. In the instant case, the escape of natural gas caused an explosion and fire that resulted in bodily injury and property damage. The alleged bodily injury and property damage were therefore caused by the contaminating nature of natural gas.

¶74 Chartis's counterarguments are unpersuasive.

¶75 The three principal cases upon which Chartis relies to support its causation argument are Guenther v. City of Onalaska, 223 Wis. 2d 206, 588 N.W.2d 375 (Ct. App. 1998); Beahm v. Pautsch, 180 Wis. 2d 574, 510 N.W.2d 702 (Ct. App. 1993); and URS Corp. v. Zurich American Insurance Co., 979 N.Y.S.2d 506 (Sup. Ct. 2014). None of these cases persuades us to adopt Chartis's position in the instant case.

¶76 Guenther and Beahm interpret pollution exclusion clauses in general liability policies; they do not interpret pollution liability policies such as the CPL policy at issue in the present case. As we explained above, the interpretation of

---

[41] "If a natural gas leak has occurred and is severe, oxygen can be reduced, causing dizziness, fatigue, nausea, headache, and irregular breathing." U.S. Nat'l Library of Med., "Natural Gas," Tox Town, toxtown.nlm.nih.gov/text_version/chemicals.php?is=18 (last updated Oct. 29, 2014). Further, "[e]xposure to extremely high levels of natural gas can cause loss of consciousness or even death." Id.

the words "pollutant" and "contaminant" in a pollution exclusion clause in a general liability policy will not necessarily be the same as the interpretation of the terms "pollution condition" and "contaminant" in a coverage provision in a pollution liability policy. Guenther and Beahm, therefore, do not control the instant case.

¶77 Furthermore, even assuming Chartis is correct that the "contaminating nature" reasoning in Guenther and Beahm applies to the instant case, we conclude that the damage alleged in the four lawsuits was caused by the contaminating nature of natural gas.

¶78 URS, in contrast, does interpret a pollution liability policy. URS is one of the few cases interpreting a pollution liability policy.[42] But URS is not persuasive. The facts in URS are readily distinguishable from the facts in the instant case and the analysis in URS relies on New York case law that differs from Wisconsin case law.

¶79 We briefly review these three cases.

¶80 In Guenther, homeowners sued the City of Onalaska when a sewer backed up and spewed sewage into their basement, causing damage. The City's general liability policy had a pollution exclusion clause that excluded coverage for any claim arising

---

[42] URS Corp. v. Zurich Am. Ins. Co., 979 N.Y.S.2d 506, 510 (Sup. Ct. 2014) ("There are, in fact, few cases that deal with interpretation of a pollution liability policy.").

25

out of "contamination . . . by POLLUTANTS."[43]   The parties disputed whether the damage to the Guenthers' basement caused by a sewage back-up constituted contamination by pollutants.   The insurance company asserted that the back-up did constitute contamination by pollutants and denied coverage.

¶81 The court of appeals disagreed, in part, with the insurance company's position.   The court of appeals reasoned that the policy's definition of "contamination" implies that for contamination to occur, the alleged harm "must be caused by the toxic nature of the discharged material."[44]   The damage to the basement was apparently caused to some extent by the liquid nature of the sewage——not by its toxic nature.[45]

¶82 The court of appeals in Guenther therefore held that the policy provided coverage for any damage caused by the liquid nature of the sewage and not its toxic nature.   To the extent the damage was caused by the toxic nature of the sewage, however, the court of appeals concluded that the damage constituted contamination by pollutants and the policy's pollution exclusion clause barred coverage.

¶83 In Beahm, Wilson Mutual Insurance Company's insured was in the business of setting fires to burn off grass.   One such fire became uncontrollable, with smoke blowing across a

---

[43] Guenther v. City of Onalaska, 223 Wis. 2d 206, 211, 588 N.W.2d 375 (Ct. App. 1998).

[44] Id. at 213.

[45] Id. at 215.

26

nearby highway and obscuring the vision of motorists. A multi-vehicle accident resulted.

¶84 Wilson Mutual denied coverage for the incident because of its policy's pollution exclusion clause. The policy listed "smoke" in its definition of "pollutant."[46] The court of appeals disagreed with Wilson Mutual's assessment, concluding that a reasonable insured would believe the pollution exclusion clause excluded coverage only when the alleged damage was caused by the toxic nature of smoke.[47]

¶85 The Beahm court determined that the multi-vehicle accident resulted because smoke is an opaque substance, not because smoke "may have toxic properties which may corrode property or injure a person's eyes, skin or respiratory system."[48] Thus, the pollution exclusion clause in the Wilson Mutual policy did not bar coverage.

¶86 Guenther and Beahm do not support Chartis in the present case. Even accepting Chartis's argument that the "contaminating nature" analysis in Guenther and Beahm applies to the instant case, we have already determined that the damage alleged in the four lawsuits was caused by the contaminating nature of natural gas. Consequently, the causation requirement Chartis proposes has been fulfilled in the instant case.

---

[46] Beahm v. Pautsch, 180 Wis. 2d 574, 580, 510 N.W.2d 702 (Ct. App. 1993).

[47] Id. at 584-85.

[48] Id. at 584.

27

¶87 Unlike Beahm and Guenther, URS involves a pollution liability policy. URS is not helpful to Chartis, however.

¶88 In URS, the Hudson Specialty Insurance Company was obligated to cover damage caused by pollution conditions on any site where an insured was performing contracting operations. The Hudson policy's definition of "pollution conditions" is identical to the definition provided by Chartis's CPL policy.[49]

¶89 A fire took place at a building at which a Hudson insured was performing contracting operations. Lawsuits were filed against the insured alleging that its negligence resulted in the creation of fire hazards within the building; that these fire hazards eventually caused a fire to break out; and that the fire caused death and injury to firefighters who responded to the emergency.

¶90 Hudson maintained that none of the alleged deaths or injuries arose out of a pollution condition as required by its pollution liability policy. The URS court agreed with Hudson.[50] In reaching this conclusion, the URS court stressed the "close identity between the traditional pollution exclusion provision and Hudson's pollution coverage provision."[51] Because of this "close identity," the URS court relied on New York cases interpreting pollution exclusion clauses in general liability

---

[49] See URS, 979 N.Y.S.2d at 507-08.

[50] Id. at 511.

[51] Id. at 510 (emphasis added).

28

policies when construing the Hudson policy's pollution coverage provision.[52]

¶91 New York's pollution exclusion cases had interpreted pollution exclusion clauses as barring coverage for "broadly dispersed environmental pollution."[53] Thus, the URS court held that under New York law, a pollution liability policy insures against claims arising from broadly dispersed environmental pollution, not pollution occurring within the confined environment of a building.[54]

---

[52] The URS court also relied on Colonial Oil Indus. Inc. v. Indian Harbor Ins. Co., 528 Fed. Appx. 71 (2nd Cir. 2013). Colonial Oil interpreted a pollution coverage policy similarly worded to the one in URS.

Colonial was a corporation whose business involved transporting, storing, and selling fuel oil. Colonial received a delivery of 25 truckloads of oil, which were unloaded into one of Colonial's storage tanks. Colonial later discovered that this fuel oil was contaminated with polychlorinated biphenyl, a pollutant. Colonial lost the oil as a result and incurred costs for decontamination and remediation. Colonial sought coverage for the incident under its pollution and remediation liability policy.

Applying New York law, the federal court of appeals concluded that the policy did not cover Colonial's claim. Coverage under the policy was limited to "pollution conditions," which was defined as the "discharge, dispersal, release, seepage, migration, or escape of POLLUTANTS." Colonial Oil, 528 Fed. Appx. at 73 (emphasis added). Because the pollutant in the oil remained confined in Colonial's storage tanks and was never released into environment, the federal court of appeals concluded that the events did not constitute a "pollution condition" as required by the policy.

[53] See URS, 979 N.Y.S.2d at 510.

[54] Id. at 511.

¶92 Our case law interpreting pollution exclusion clauses in general liability policies does not take the same approach as the New York cases. Wisconsin cases have not interpreted pollution exclusion clauses as dealing solely with broadly dispersed environment pollution. We are therefore not persuaded by the reasoning or conclusion of the New York court in URS.

¶93 In sum, Guenther, Beahm, and URS do not convince us to adopt Chartis's proposed requirement that the contaminating nature of the contaminant cause the damage. These cases are not dispositive of the instant case because the facts, policy language, or governing law are different in the instant case. Nonetheless, we are convinced that Chartis's proposed requirement has been fulfilled in the instant case, and thus that Acuity prevails.

¶94 For these reasons, we conclude that the bodily injury and property damage alleged in the underlying lawsuits were "caused by Pollution Conditions" as required by Chartis's CPL policy.

3

¶95 We turn, finally, to Chartis's contention that concurrent coverage under Acuity's CGL policy and Chartis's CPL policy is not possible in the instant case. Chartis argues that if Acuity's policy covers the insured's liability in the instant case, Chartis's policy does not.

¶96 Chartis spends a considerable portion of its brief claiming that the manifest intent of the two policies is that Chartis's policy covers the insured's liability for pollution

and Acuity's policy excludes it. Chartis explains that the CGL policy issued by Acuity and the CPL policy issued by Chartis "are essentially the flip side" of each other. Chartis asserts that "the Acuity CGL Policy is intended to cover [the insured's] liability for bodily injury or property damage <u>not caused by pollution</u>, and the Chartis Pollution Policy is intended to cover liability for bodily injury or property damage <u>caused by pollution</u>." (Emphasis added.)

¶97 In sum, Chartis argues that the four lawsuits allege non-pollution losses covered by Acuity, not pollution losses covered by Chartis.

¶98 Although Chartis may be correct that CPL policies were designed to fill the gap in coverage created by pollution exclusions in CGL policies, the coverage terms of Chartis's CPL policy are not the mirror image of the pollution exclusion clause in Acuity's CGL policy. Slightly different language can have slightly different meanings. Furthermore, our approach to construing a pollution exclusion clause in a commercial liability policy differs from our approach to construing the coverage terms in a pollution liability policy.

¶99 Depending on the language of the policies and the facts of the case, it is entirely possible for both a commercial general liability policy with a pollution exclusion clause and a contractors' pollution liability policy to cover the insured's liability.

¶100 The very terms of Chartis's CPL policy further support our position that the two policies can simultaneously cover the

31

insured's liability. Specifically, the "other insurance" sections described above demonstrate that when drafting its CPL policy, Chartis contemplated concurrent coverage between the CPL policy and other insurance policies, including general liability policies.

¶101 Finally, we note that our determination that Chartis's CPL policy provides coverage in the instant case does not necessarily mean concurrent coverage exists. Acuity defended and indemnified the insured, but the question of whether Acuity's CGL policy covers the insured's liability for the natural gas-fueled explosion and fire is not before us and we do not decide it.

* * * *

¶102 For the reasons set forth, we agree with the circuit court's determination that that the escape of natural gas from the damaged pipe was a pollution condition under Chartis's CPL policy and that this pollution condition caused the bodily injury and property damage alleged in the four lawsuits. We therefore conclude that Chartis's CPL policy covers the insured's liability arising from the natural gas-fueled explosion and fire. Chartis must pay its share of the defense fees and indemnity payments as ordered by the circuit court. Accordingly, we reverse the decision of the court of appeals and remand the cause to the circuit court to reinstate the judgment in favor of Acuity and against Chartis.

*By the Court.*—The decision of the court of appeals is reversed.